614 So.2d 1346 (1993)
Edna G. LANTIER, Plaintiff-Appellant,
v.
AETNA CASUALTY & SURETY COMPANY, et al., Defendants-Appellees.
No. 92-335.
Court of Appeal of Louisiana, Third Circuit.
March 3, 1993.
*1348 Nicholas Gachassin Jr., Lafayette, for Edna G. Lantier.
Kenneth Michael Henke, Lafayette, for Aetna Cas. & Sur. Co.
Edward O. Taulbee IV, Lafayette, for Webb.
Before GUIDRY, LABORDE and DECUIR, JJ.
GUIDRY, Judge.
This case concerns an airboat accident which resulted in the drowning deaths of Eddie Cormier and Freddie Lantier. Sue and Sarah Cormier, Eddie's wife and minor daughter, sued Glenn Webb, the owner and operator of the airboat, and Aetna Casualty and Surety Company, Webb's homeowner's insurance carrier, under general maritime law pursuant to the federal "savings to suitors" clause. Edna Lantier, Freddie's wife, also sued Webb and Aetna and, thereafter, the suits were consolidated for trial. The companion suit, entitled Cormier v. Aetna Casualty and Surety Company, is separately reported at 614 So.2d 1359 (La. App. 3rd Cir.1993). The issues presented in this case are identical with those presented in the companion case. We consider and dispose of all issues in both cases in this opinion but render a separate decree in the Cormier case.
Aetna denied coverage, asserting that its homeowner's policy issued to Webb contained *1349 a watercraft exclusion. After trial, the jury determined that Webb was not negligent and that his airboat was not defective. The jury did not reach the insurance coverage issue. In accordance with these findings, the trial court rendered judgment dismissing plaintiffs' actions. Plaintiffs appealed. Because we conclude the jury's finding that Webb was not negligent is manifestly erroneous, we reverse.

FACTS
On the night of February 27, 1987, Webb, Cormier, Lantier and Harold Stutes set out on a frogging expedition from a houseboat moored in Bayou Long in St. Martin Parish. Cormier, Lantier and Stutes travelled in a small flat-bottomed aluminum boat while Webb piloted his 13½ foot airboat. When the group reached the point at which Bayou Long intersects the Gulf Canal, they moored the small flat-bottomed boat to the bank of Bayou Long. Cormier, Lantier and Stutes then walked over land to the Gulf Canal and joined Webb in the airboat which he had driven into the Gulf Canal. The entire group then proceeded together up the Gulf Canal, a narrow and very shallow offshoot of Bayou Long. After a few hours of frogging, the weather became stormy and the men decided to return to the houseboat.
Upon arriving at the Gulf Canal-Bayou Long intersecting point, Webb entered the much deeper Bayou Long and steered his airboat to the right to get as close as possible to the small boat. As Webb executed this maneuver, the left side of the airboat began to take on water and the airboat quickly sank under the four men. Unfortunately, only Webb and Stutes made it to the small boat, while Cormier and Lantier drowned.
Webb was the only survivor of the incident to testify at trial. He stated that Cormier was his partner in Cajun Custom Cabinets and that they had been good friends for many years. Webb built his airboat with Cormier's assistance using a design from Dixie Airboats of Texas. It was powered by a 150-horsepower Ly-Comming airplane engine. Webb did not incorporate any flotation material in the hull and did not have the airboat rated for weight capacity. The airboat was properly registered with and licensed by the Louisiana Department of Wildlife and Fisheries.
According to Webb, the Gulf Canal, which is usually dry, contained approximately six to twelve inches of water on the night in question. Bayou Long, by contrast, is a deep, navigable waterway. Ordinarily, a boat's ability to access the Gulf Canal depends upon the river stage, i.e., the water depth of Bayou Long. He testified that, earlier in the day, he had scouted the area with his father, Stutes, and Lantier. While entering Bayou Long from the Gulf Canal later that night, Webb operated the airboat from the center driver's seat while Lantier and Cormier sat on a bench behind him and Stutes sat on a pedestal in front. The men did not wear life jackets, although the airboat was properly equipped with four jackets.
Webb testified that, as he "pivoted" or "rotated" the airboat to the right while the vessel was 20 feet into Bayou Long, it began to take on water on its left side. He further stated that the engine was operating at idle speed through the entire maneuver. According to Webb, the airboat "sank within seconds". All four men surfaced, and Webb asked the three other men if they were all capable of swimming to the small boat. After the others responded affirmatively, Webb began swimming toward the small boat. Only he and Stutes successfully swam to safety. They immediately began searching for Cormier and Lantier, to no avail. Webb then called the St. Martin Parish Sheriff's Department. Captain August Dupuis was dispatched to investigate the incident, and the bodies of Lantier and Cormier were recovered within a few hours.

PROCEDURAL HISTORY
Prior to trial, Aetna filed a motion for summary judgment asserting that, because of a watercraft exclusion in the policy at issue, it did not provide insurance coverage for this incident. The exclusion relied upon provided:

*1350 1. Coverage EPersonal Liability and Coverage FMedical Payments to Others do not apply to bodily injury or property damage:
* * * * * *
f. arising out of:
(1) the ownership, maintenance, use, loading or unloading of a watercraft described below;
* * * * * *
Watercraft:
(1) with inboard or inboard-outdrive motor power owned by an insured;
* * * * * *
Aetna argued that an airboat qualified as a watercraft with inboard motor power. The trial court denied Aetna's motion for summary judgment.
Plaintiffs each filed a motion for summary judgment and/or declaratory judgment seeking to have Aetna's exposure for damages set (in the event that the trial court would find Webb liable) at $100,000 per decedent, the policy limit per occurrence. The trial court granted the plaintiffs' motion, finding that "... there were in fact two occurrences and that the limits per occurrence are in full force and effect in this accident".
Plaintiffs also filed a motion in limine seeking to prohibit Aetna from inquiring into the intentions of Webb and Aetna with respect to whether Webb thought that the Aetna policy provided coverage for the airboat. Specifically, the plaintiffs wanted to prevent Aetna from eliciting testimony from Webb concerning his attempts to obtain separate insurance for the airboat after he completed its construction. The trial court granted the plaintiffs' motion. In doing so, the trial judge limited the scope of evidence on this issue to the Aetna policy itself and the fact that Webb built the airboat after the policy was in effect. However, the trial court allowed evidence of intent to be proffered by Aetna, and Webb's testimony on this issue is contained in the record on appeal.
The case proceeded to trial by jury. Before testimony began, the Cormiers' attorney filed a motion in limine seeking to prohibit any questions concerning whether the decedents were wearing life jackets. In essence, he attempted to limit the evidence which may tend to show comparative fault on the part of Cormier and Lantier. The trial judge denied the Cormiers' motion.
After the jury was sworn and two witnesses testified, defendant Webb filed a motion to strike the trial by jury. The trial court, while finding that the motion had merit, denied the motion to strike as untimely. At the conclusion of the trial, plaintiffs filed a motion for directed verdict, which was denied. After the jury found Webb free from fault, plaintiffs' final motion for judgment notwithstanding the verdict was also denied.
On appeal, plaintiffs assign the following errors:
1. The district court erred in failing to strike the jury trial.
2. The jury's verdict was clearly erroneous, and the district court erred in failing to direct a verdict or to grant judgment notwithstanding the verdict in favor of plaintiffs-appellants on the issue of fault, negligence and/or strict liability.
3. The district court erred in charging the jury on comparative fault.
4. The district court erred in failing to direct a verdict or grant judgment notwithstanding the verdict on the issue of insurance coverage.
5. The district court erred in failing to award damages in favor of plaintiffs-appellants and against defendants-appellees for the full amount of the plaintinffs' claims.

JURY TRIAL
Appellants argue that the trial court erred in denying defendant Webb's motion to strike trial by jury. Specifically, they claim that since, on the date of trial, a jury trial would not have been available in federal court, a jury trial was also unavailable in this action brought in state court under the "saving to suitors" clause. The trial court denied Webb's motion to strike because it was not timely filed.
*1351 The Cormiers filed suit on November 16, 1987, and Lantier filed suit on June 14, 1988. Both suits were filed prior to September 9, 1988, the effective date of La. C.C.P. art. 1732(6), added by Act 147, § 1 of 1988, which denies the right to a jury trial in suits on admiralty or general maritime claims filed in state court under a federal "saving to suitors" clause if the plaintiff designates the suit as an admiralty or general maritime claim. This provision, which duplicates the language of Federal Rule 9(h), was enacted to give the plaintiff the exclusive right to control whether to have a jury trial. Heinhuis v. Venture Associates, Inc. of Louisiana, 558 So.2d 1244 (La.App. 1st Cir.1990), writ denied, 559 So.2d 1369, 1385 (La.1990). The amendment adding La.C.C.P. art. 1732(6) has been held to be substantive. Ford v. McDermott, 543 So.2d 1135 (La.App. 1st Cir.1989); Gauchet v. Chevron USA Inc., 541 So.2d 272 (La.App. 4th Cir.1989). If in fact the amendment is substantive, it would not apply retroactively to affect the instant matters, both of which were filed prior to the effective date of the amendment.
Before the amendment, a plaintiff had the right to a jury trial in state court under the federal "saving to suitors" clause of 28 U.S.C. § 1331 if: (1) plaintiff could have brought a general civil suit in federal district court because of complete diversity of citizenship, and (2) the amount in question exceeded the amount required for federal court jurisdiction. Lavergne v. Western Company of North America, Inc., 371 So.2d 807 (La.1979); Ford, supra. Under the law in effect at the time the instant suits were filed neither party to these suits had the right to a jury trial because of the lack of complete diversity. We need not consider whether La.C.C.P. art. 1732(6) is applicable because the result would be the same regardless of which law is applied.
The record indicates that, on July 29, 1988 by supplemental and amending answer, Aetna timely requested a jury trial and provided a bond therefor. Neither plaintiffs nor defendant, Webb, filed any opposition to or motion to strike Aetna's request until Webb filed a motion to strike at the conclusion of the first day of trial on October 8, 1990.
A motion to strike "shall be filed within 10 days after service of the pleading upon mover, except that a defendant may move to strike any matter from the petition at any time within 15 days of the service". La.C.C.P. art. 964. The trial court properly denied the motion to strike as untimely. In Callahan v. Town of Bunkie, 287 So.2d 629 (La.App. 3rd Cir.1973), writ not considered, 290 So.2d 905 (La.1974), we held that the defendant town, which was statutorily protected from trial by jury by La.R.S. 13:5104 (redesignated as La.R.S. 13:5105 by Act No. 434, § 1 of 1975), could, in its own discretion, proceed with a trial by jury and thereby waive its statutory protection. The town had not objected to trial by jury until appeal. In concluding that the town waived its statutory protection, we reasoned that to construe the article "... as an all encompassing prohibition against jury trials even after the manifestation of consent thereto by the state or other public body ... would be to allow the state or other public body to have `two bites at the apple'". Callahan, supra at 636. See also Simmons v. Beauregard Parish School Board, 315 So.2d 883 (La.App. 3rd Cir.1975), writ denied, 320 So.2d 207 (La. 1975). Similarly, by failing to timely object prior to trial and not joining in Webb's motion to strike during trial, the plaintiffs in this case waived their right to raise the lack of complete diversity or the application of La.C.C.P. art. 1732(6) as a bar to trial by jury. Plaintiffs cannot now be heard to complain of a defect in the proceedings raised only by defendant Webb during trial and to which they clearly acquiesced at trial. La.C.C.P. art. 1635. Accordingly, the trial court's ruling with respect to Webb's motion to strike was not erroneous.

NEGLIGENCE AND STRICT LIABILITY
The jury found that Webb was not negligent and that the airboat was not defective. Plaintiffs contend that both of these findings are manifestly erroneous. It is well settled that the jury's factual findings are entitled to great weight on appeal, and that *1352 the appellate court may not reverse factual determinations in the absence of manifest error. Rosell v. Esco, 549 So.2d 840 (La. 1989).

Negligence
Plaintiffs argue that Webb negligently operated and supervised his airboat, which proximately caused the airboat to sink and the two passengers to drown. In the alternative, plaintiffs assert that, in the absence of specifically identifiable acts which constitute negligence, we should apply the doctrine of res ipsa loquitor to find Webb negligent. We agree with plaintiffs' argument on the applicability of res ipsa loquitor. We reverse as clearly wrong the jury's determination that Webb was not negligent.
For liability based on negligence to attach, the plaintiff bears the burden of establishing that:
(1) The conduct in question was a cause in fact of resultant harm;
(2) The defendant owed a duty to plaintiff;
(3) The duty owed was breached; and,
(4) The risk or harm caused was within the scope of the breached duty.
Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La.1992); Fox v. Board of Supervisors of Louisiana State University, 576 So.2d 978 (La.1991).
Res ipsa loquitor, i.e., the thing speaks for itself, is a rule of circumstantial evidence which allows a court to infer negligence on the part of the defendant if the facts indicate that the defendant's negligence is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. Spott, supra; Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989). It does not dispense with the rule that negligence must be proven, but gives the plaintiff the right to place on the scales, "along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence" sufficient to shift the burden of proof. Cangelosi; supra; Montgomery v. Opelousas General Hospital, 540 So.2d 312 (La.1989). Generally, res ipsa obtains when the following criteria are met:
(1) The circumstances surrounding the accident are so unusual that, in the absence of other pertinent evidence, there is an inference of negligence on the part of the defendant;
(2) The defendant had exclusive control over the thing causing the injury;
(3) The circumstances are such that the only reasonable and fair conclusion is that the accident was due to a breach of duty on the part of the defendant.
Spott, supra, at 1362-63. The testimony and evidence indicates that the only reasonable and fair conclusion is that the accident was due to fault on the part of Webb.
Webb testified that, as he made the turn, the airboat, which already contained rainwater, began to take in water on its left side. The airboat then sank within seconds. Webb stated that he did not know what caused water to enter the boat on its left side. Further, he gave no reason for not stopping along the Gulf Canal bank in shallow water to allow the three passengers to walk the short distance to the other boat.
Arthur Sargent, plaintiffs' expert in naval architecture, testified that, in his opinion, the airboat sank as Webb made the right turn and the left hull dipped into the deeper Bayou Long water. He stated the accident was caused by a combination of factors: steering, rainwater in the hull, and venturing into the deeper water of Bayou Long. Sargent further explained that, whenever an airboat is turned, regardless of the throttle speed, the airblast from the propeller onto the rudders will produce an overturning movement of the boat to the left side. If the airboat already has water in the hull, the degree of the leftward lean will be exaggerated.
August Dupuis, the investigating officer for the St. Martin Parish Sheriff's Department, testified that, at the time of the accident, the river stage caused Bayou Long's water level to dip below that of the shallower Gulf Canal. This caused a small dip at the point where the two bodies of *1353 water met. When Webb hit this dip and travelled into the deeper Bayou Long, the airboat sank.
In Holman v. Reliance Insurance Companies, 414 So.2d 1298 (La.App. 2d Cir. 1982), writ denied, 420 So.2d 164 (La.1982), a boating accident case in which the plaintiff passenger was thrown from her seat and injured when the driver made a sharp 90 degree turn, our brethren of the Second Circuit held that the trial court erred in failing to apply the doctrine of res ipsa loquitor to the facts of that case. Similarly, we find that only Webb's violation of the duty of ordinary care in the operation of the airboat under the particular circumstances of this case could have caused the boat to take on water and sink within seconds. This accident is one which does not ordinarily occur in the absence of negligence, and additionally, the boat which caused the deaths by drowning was in Webb's exclusive control. Applying res ipsa, the evidence, as a whole, indicates that the most probable cause of the accident was Webb's negligence. We therefore conclude that Webb is liable to plaintiffs due to his negligent breach of duty which caused this accident.

Strict Liability
Because we find Webb was negligent and thus liable, we need not reach the issue of whether he is also liable under the theory of strict liability for constructing and operating an allegedly defective airboat.
The record before this court on appeal is complete. Under the jurisprudential rule announced in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), in the interest of judicial economy, we are obligated to decide the merits of the remaining issues in this case.

COMPARATIVE FAULT
The jury did not reach the issue of the comparative fault of Cormier and Lantier. The trial judge instructed the jury on this issue. Plaintiffs contend the court erred in doing so because no factual basis for assigning fault to their decedents was established at trial. Alternatively, plaintiffs assert that if evidence of the decedents' failure to wear life jackets was sufficient to place the comparative fault issue before the jury, we should nevertheless find that Cormier and Lantier were not at fault. They argue that this situation should be analogized to one covered by La.R.S. 32:295.1, which generally mandates automobile safety belt use, but in subsection (E) provides:
In any action to recover damages arising out of the ownership, common maintenance, or operation of a motor vehicle, failure to wear a safety belt in violation of this Section shall not be considered evidence of comparative fault. Failure to wear a safety belt in violation of this Section shall not be admitted to mitigate damages.
We find that the trial court did not err in instructing the jury on comparative fault principles. The record reflects that the only possible factual basis for assigning fault to Cormier and Lantier was their failure to wear life jackets. This fact was undisputed at trial and was sufficient to place the comparative fault issue before the jury. Because the jury did not reach this issue, we shall determine whether the conduct of Cormier and Lantier in failing to wear life jackets in any way caused their deaths.
In assessing the nature of the conduct of Cormier and Lantier in relation to that of Webb, Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985) directs us to consider the following factors:
(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) How great a risk was created by the conduct;
(3) The significance of what was sought by the conduct;
(4) The capacities of the actor, whether superior or inferior;
(5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
The record indicates that, on the first leg of their journey from the houseboat *1354 to the entrance of the Gulf Canal, both Cormier and Lantier wore their life jackets. When they entered the much shallower Gulf Canal, they removed their life jackets and did not put them back on while returning to the houseboat. We note that, unlike the mandatory automobile safety belt statute, La.R.S. 34:851.24(F) requires only that at least one readily accessible life preserver per person be placed on board the vessel. The statute further requires that persons under 12 years of age wear a life jacket or life preserver while the vessel is underway. No such requirement exists for persons over 12 years of age. By analogy, if failure to wear an automobile seat belt is not to be considered evidence of comparative negligence even when the wearing of a seat belt is mandated by law, the failure to wear a life preserver should also not be considered evidence of comparative negligence especially when it is not mandated by law. In Johnson v. State Farm Fire and Casualty Company, 303 So.2d 779 (La.App. 3rd Cir.1974), we held that, under the facts of that case, the decedent's failure to wear a life jacket did not constitute contributory negligence.
After consideration of the Watson factors and the above cited statutes and jurisprudence, we conclude that, under the particular facts and circumstances of this case, Cormier and Lantier, in failing to wear life jackets, were not in any way at fault for causing their deaths.

COVERAGE UNDER THE AETNA POLICY
The jury did not reach the issue of whether the Aetna homeowner's policy issued to Webb provided coverage for this accident. Aetna denies coverage, relying on the aforementioned policy exclusion in arguing that the airboat is an inboard motor powered watercraft. Plaintiffs and defendant Webb, on the other hand, argue that the exclusion does not specifically exclude airboats, that an airboat is not an inboard motor powered watercraft, and, in any event, the contractual exclusion itself is ambiguous and should be strictly construed against Aetna and in favor of coverage.
The legal principles applicable to the interpretation of insurance contracts are well settled. In Pareti v. Sentry Indemnity Company, 536 So.2d 417, 420 (La. 1988), the Supreme Court stated:
An insurance policy is a contract and, as with all other contracts, it constitutes the law between the parties. If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written.
An insurance contract is to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another. If there is an ambiguity in a policy, then that ambiguity should be construed in favor of the insured and against the insurer. However, courts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language. (citations omitted).
In the absence of a conflict with statutes or public policy, insurers have the same rights as do individuals to limit their liability and to enforce whatever conditions they please upon their obligations. Unambiguous provisions in the insurance contract limiting liability must be given effect. May Company, Inc. v. Riverside Life Insurance Company, 546 So.2d 328 (La.App. 3rd Cir. 1989). However, if the language of the exclusion is ambiguous and thus subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. Garcia v. St. Bernard Parish School Board, 576 So.2d 975 (La.1991).
Much of the testimony at trial centered on the meaning of the phrase "inboard motor power" as used in the policy. The issue is whether an airboat is an inboard motor powered watercraft such that coverage is excluded under the policy. Aetna argues that the airboat motor, when viewed from overhead, is clearly within the spatial boundaries of the hull, qualifying it as an inboard motor. Plaintiffs and Webb counter that, when viewed from both sides, the front, and the rear of the airboat, the *1355 motor is outside the spatial boundaries of the hull and is thus not an inboard motor.
George A. Blann, Aetna's expert marine surveyor, naval architect and marine engineer with over 20 years of Coast Guard experience, testified that he considered the airboat to be an inboard motor powered watercraft as such is defined by the Encyclopedia of Nautical Knowledge. He explained that "inboard" does not refer only to the area within the three-dimensional confines of the boat's hull. Blann described an inboard motor as one having a foundation resting on the bottom of a vessel. On cross, he conceded that the motor itself is not within the three-dimensional confines of the hull but reiterated that the motor's foundation is located inside the hull. He also acknowledged that Coast Guard regulations list airboats separately from inboard motor powered vessels.
Louis Bell, the president of Panther Airboats of Florida, an expert in airboat design, manufacturing and industry standards, testified that he personally and the airboat industry generally considers airboats as inboard motor powered boats. Like Blann, he also conceded that, from every angle except the overhead view, the motor is set above and outside the confines of the hull.
Arthur Sargent, plaintiffs' naval architecture expert, testified that, because the airboat engine is above the hull, it is not an inboard motor and does not fit within the policy exclusion. He relied mainly on Coast Guard regulations, specifically 33 C.F.R. § 183.101(F), which lists "airboats" as separate from "inboard" or "outboard" vessels in mandating flotation requirements. He conceded that the regulations, which apply to commercial manufacturers, would probably not apply to Webb's airboat because Webb built it himself. Sargent stated that, nautically, "inboard" means toward the center line inboard of the rails. According to Sargent, an airboat engine can only be technically considered "inboard" when viewed from above.
Rudy Vorenkamp, plaintiffs' expert in marine surveying with 50 years of experience in the marine industry, testified that an airboat is distinctly different from what is commonly known in the industry as an inboard motor powered vessel. He surmised that, had the Coast Guard intended to include airboats within the "inboard" classification, it would not have listed airboats as a separate class of vessel in its regulations.
Kenneth Laperouse, a wildlife agent with the Louisiana Department of Wildlife and Fisheries, testified that, for purposes of state registration, an airboat is classified as an "other vessel". It is not considered an inboard, inboard-outdrive, or outboard motor powered watercraft.
Given this divergently conflicting testimony, it is obvious that the exclusion relied upon by Aetna can yield two reasonable interpretations: one which includes airboats within the class of inboard motor powered vessels and one which does not include airboats therein. The former would result in an exclusion from coverage, while the latter would result in coverage. In this respect, the exclusion is ambiguous and is to be construed against the insurer, Aetna, and in favor of the insured, Webb. Therefore, we conclude that Webb's homeowner's policy issued by Aetna provided coverage for this accident.

MOTION IN LIMINE
Prior to trial, the judge, in granting plaintiff's motion in limine, ruled that evidence of Webb's intent at the time he purchased the homeowner's policy and of the fact that he sought separate coverage for the airboat was irrelevant and, thus, inadmissible. Aetna was allowed to proffer such evidence in order to preserve it in the record for purposes of this appeal. In brief, Aetna urges error in the trial court's ruling.
Louisiana Code of Evidence article 401 defines relevant evidence as follows:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
*1356 The proffered testimony of Webb established that he attempted to secure separate coverage for the airboat from eight or nine different agents. He was unsuccessful in obtaining such coverage. He did not attempt to procure separate coverage from Aetna, nor did he inform Aetna that he owned an airboat or any other boat. He admitted that, like most homeowners, he is not very familiar with the specific coverages and exclusions contained in the Aetna policy. Furthermore, Webb stated that the Aetna policy was purchased 18 years ago, at the time his house was built, through the bank which financed his home loan. The premiums were paid through his monthly mortgage note payments. He never spoke with or negotiated with any representative or agent of Aetna at the time of purchase or in the years following. The bank handled every aspect of policy acquisition.
Under the circumstances, even if relevant, the trial court's error in excluding such evidence was harmless. The method by which the policy was obtained establishes that, while a homeowner's policy was definitely entered into, there was no mutuality of intent arrived at through direct negotiation and agreement between Webb and Aetna with respect to this specific watercraft exclusion. The policy, which is included in the record, appears to be a standard form policy drafted solely by Aetna.

EXTENT OF AETNA'S LIABILITY
Prior to trial, plaintiffs moved for summary judgment and/or declaratory judgment on the issue of the extent of Aetna's potential exposure for Webb's personal liability under the policy. On the declarations page, the policy provides a $100,000 limit of coverage per occurrence. Plaintiffs, in their motions, argued that the term "occurrence" applied to each claim, thereby affording the $100,000 limit to Mrs. Lantier as well as Mrs. Cormier and her daughter. The trial judge ruled that there were two occurrences and, in effect, declared that Aetna's potential exposure was $200,000. Aetna neither challenged this judgment by supervisory writ application, nor did it assign as error on appeal the determination that there were two occurrences.
Generally, the definition of a judgment and the distinguishing characteristics of interlocutory and final judgments are provided in La.C.C.P. art. 1841, which states as follows:
A judgment is the determination of the rights of the parties in an action and may award any relief to which the parties are entitled. It may be interlocutory or final.
A judgment that does not determine the merits but only preliminary matters in the course of the action is an interlocutory judgment.
A judgment that determines the merits in whole or in part is a final judgment.
The judgment at issue in this case, which plaintiffs prayed for as a summary and/or declinatory judgment, was not delineated as either of these two types of judgments by the trial court. Clearly, however, it is a declaratory judgment because it declares the status of the coverage under the policy. La.C.C.P. art. 1871 provides:
Courts of record within their respective jurisdictions may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for; and the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The declaration shall have the force and effect of a final judgment or decree. (Emphasis ours)
Despite the clear wording of the final sentence of this article, the jurisprudence has created an exception to this general rule when, as in this case, the judgment establishes only the limits of liability. In Lantz v. Campbell, 376 So.2d 631, 633 (La.App. 3rd Cir.1979), we found that "... where limits of liability only have been dealt with there is not a `final judgment'". If not a final judgment, it must necessarily be interlocutory. See also Henson v. Safeco Insurance Companies, 569 So.2d 191 (La. App. 1st Cir.1990), writ granted, 572 So.2d *1357 81 (La.1991), reversed on other grounds, 585 So.2d 534 (La.1991); Wilkinson v. State Farm Mutual Automobile Insurance Company, 378 So.2d 167 (La.App. 1st Cir.1979). Compare Fulton v. Blue Cross of Louisiana, 563 So.2d 492, 495 (La.App. 4th Cir.1990), writ denied, 567 So.2d 1129 (La.1990), wherein the Fourth Circuit found that a declaratory judgment, rendered in response to appellee's motion for partial summary judgment on the issue of coverage, was a final judgment because it "... was a determination of certain merits of this controversy".
The judgment at issue established only the limit of liability under the Aetna policy, which is an incidental or preliminary matter. As such, it is an interlocutory judgment. Despite the fact that Aetna did not seek supervisory writs or specify the judgment as an error in this appeal, the correctness of interlocutory judgments are still reviewable on appeal. The trial court, after trial, granted judgment completely in favor of Aetna and Webb and against plaintiffs, dismissing their suit in its entirety. Thus, the court granted Aetna all the relief for which it prayed in answer to plaintiffs' petition. As appellee, Aetna was not obliged to answer plaintiffs' appeal to maintain as a viable issue the correctness of the interlocutory judgment because it did not seek to have the judgment appealed from modified, revised, or reversed in part. La.C.C.P. art. 2133; Diefenthal v. Longue Vue Management Corporation, 561 So.2d 44 (La.1990). Because we must decide the entire case under the ruling of Gonzales, supra, our scope of review necessarily includes the propriety of this declaratory judgment.
The Aetna policy provides, in pertinent part:
SECTION IILIABILITY COVERAGES
COVERAGE EPERSONAL LIABILITY If a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
1. pay up to our limit of liability for the damages for which the insured is legally liable;
* * * * * *
An "occurrence" is defined in the policy as "... an accident, including exposure to conditions, which results, during the policy period, in: (a) bodily injury; or (b) property damage". As mentioned, the policy provides a $100,000 limit of liability per "occurrence".
It is clear that the trial court erred in interpreting this policy, under the facts of this case, to provide a $200,000 liability limit because he found two occurrences. There was only one occurrence, the boating accident in which the airboat sank. Granted, this accident resulted in two separate deaths which gave rise to two separate claims. However, under the clear wording of the policy, the "occurrence" in this case was the boating accident, of which there was only one. Accordingly, we conclude that Aetna's total limit of liability for these two consolidated suits is $100,000. For these reasons, the interlocutory judgment of the trial court declaring that two occurrences had taken place is reversed and set aside.

QUANTUM

Survival Damages
The survival action in a suit for the death of a tort victim includes recovery for pain and suffering, loss of earnings and other damages sustained by the victim up to the moment of death. Mathieu v. State, Department of Transportation and Development, 598 So.2d 676 (La.App. 3rd Cir. 1992), writ denied, 600 So.2d 665 (La.1992). Damages for pain and suffering are properly awarded if there is evidence of any pre-death pain or suffering on the part of the deceased by his actions or otherwise. Mathieu, supra; Cupstid v. Harrison Hardwood Mfg. Co., 552 So.2d 1223 (La. App. 3rd Cir.1989), writ denied, 558 So.2d 572 (La.1990).
The record indicates that both Cormier and Lantier surfaced after the airboat sank. They responded affirmatively when *1358 Webb inquired about their ability to swim to the small boat. Thus, it was established that Cormier and Lantier were conscious for a short period of time between the accident and their eventual demise by drowning. It is also clear that they at least made a struggling attempt to swim to the bank, to no avail. Both Cormier and Lantier experienced some pre-death pain and suffering during their brief struggle to reach the shore. Under the particular facts of this case, we conclude that an award of $10,000 for the pain and suffering of each decedent is appropriate.

Wrongful Death
Damages recoverable for wrongful death, which are intended to compensate the victim's beneficiaries for their compensable injuries following the victim's death, are loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. Mathieu, supra.
Edna Lantier testified that she and her late husband were married in 1943. They had three children, all of whom were working professionally. She attributed a great part of the childrens' success to their father's guidance and his time spent with them, despite the fact that he worked irregular hours in the oil industry. According to Edna, Fred retired in 1983 at age 63 after 31 years as a mechanic for Dowell. During the years between Fred's retirement and untimely death, Edna and Fred travelled together in their camper over most of the United States and Canada for six weeks at a time. They spent most of their non-travelling time by fishing together. Additionally, they belonged to the Golden Age Society and participated in many CODOFIL (Council for the Development of French in Louisiana) activities. They were also active in church activities, and Fred was a 30 year member of the Knights of Columbus and a Boy Scout leader. She further stated that Fred was quite a handyman around the house, able to fix almost anything. Edna concluded her testimony by stating that she misses Fred very much, and she rarely participates in any of the many activities they used to take part in together.
Russell Lantier, their son, testified that his parents had a very strong, loving relationship and that his late father was a very loving grandfather to his young son. He noted that it is obvious to him that his mother greatly misses his father's companionship.
Clearly, Edna and Fred Lantier had a very warm, loving and exceptionally close relationship. His death has left her not only alone but also very lonesome and distraught. The record contains no evidence regarding any economic loss suffered by Edna Lantier as a result of Fred's death. Under the circumstances, an award of $125,000 to Edna Lantier for loss of love and affection is appropriate. Additionally, we award her $4,857.26 in funeral expenses stipulated to at trial by the parties.
At trial the parties stipulated to the following facts: Eddie Cormier was 35 years old at the time of his death and had a remaining life expectancy of 38.9 years and a work life expectancy of 25.3 years. Additionally, 1985 income tax returns entered into evidence show Eddie earned $33,000 as a partner in Cajun Custom Cabinets. No further evidence was presented at trial. We conclude that an award of $125,000 to Sue Cormier and $50,000 to Sarah Cormier for loss of services and support is reasonable.
Sue Cormier, wife of the late Eddie Cormier, testified that they were married in 1983 and had a six month old daughter, Sarah. She characterized their relationship as excellent. Eddie and Sue did many things together including hunting, fishing and going to LSU football games and concerts. After his death, she moved to Baton Rouge to be closer to her family. She stated that she no longer participates in the activities which she and Eddie enjoyed.
Ruth Durlacher, Sue Cormier's mother, testified that Sue was devastated when she found out about Eddie's death. According to Ms. Durlacher, Sue still talks constantly about Eddie and his daughter, Sarah, says she "misses [her] dad".
*1359 Based on the facts established in the record, we award, for loss of love and affection, $100,000 to Sue Cormier and $50,000 to Sarah Cormier. Additionally, as stipulated by the parties at trial, Sue is entitled to recover $3,835.90 in funeral expenses.

AETNA'S LIABILITY FOR DAMAGES IN EXCESS OF POLICY LIMITS
On appeal, plaintiffs contend that Aetna's liability for the judgment awarded herein extends beyond its policy limits because Aetna failed to settle within the policy limits when it had the opportunity to do so. We disagree.
It is well settled that the insurer has a duty to consider the insured's interest as paramount when an offer to settle is made. Louisiana law does not authorize the plaintiffs, who are not insureds under the Aetna policy, to seek damages against Aetna for its alleged bad faith in settlement negotiations and for exercising its contractual right to provide a defense to the insured. Bellah v. State Farm, 546 So.2d 601 (La.App. 3rd Cir. 1989). This duty to not conduct settlement negotiations in bad faith and to not act arbitrarily and capriciously under the circumstances is owed by the insurer to its insured only. The insurer may only be liable to its insured for the judgment in excess of policy limits resulting from the insurer's bad faith failure to accept a reasonable settlement within policy limits. Thus, the plaintiffs have no cause of action in this regard and Aetna's direct liability to plaintiffs for damages does not exceed its policy limits.

DECREE
For the above and foregoing reasons, the judgment of the trial court is reversed and set aside and judgment is rendered in favor of Edna Lantier and against defendants, Glenn Webb and Aetna Casualty and Surety Company, in solido, in the sum of One Hundred Thirty Nine Thousand Eight Hundred Fifty-Seven and 26/100 ($139,857.26) Dollars, together with judicial interest on such sum from date of judicial demand until paid, subject however to the limitation of Aetna Casualty and Surety Company's liability to its policy limits as fixed herein. It is further ordered that Glenn Webb and Aetna Casualty and Surety Company are cast with all costs of these proceedings both at the trial level and on appeal.
REVERSED AND RENDERED.