IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-4068
_____

THE SOCIETY OF THE ROMAN CATHOLIC CHURCH OF THE
DIOCESE OF LAFAYETTE AND LAKE CHARLES, INC.,

                            Plaintiff-Appellee-Cross
                            Appellant-Appellant and
                            Cross-Appellee,

                versus

INTERSTATE FIRE & CASUALTY CO., ET AL.,

                            Defendants,

ARTHUR J. GALLAGHER & COMPANY AND GALLAGHER
BASSETT SERVICES, INC.,

                            Defendants-Appellees-Cross
                            Appellants,

                versus

INTERSTATE FIRE & CASUALTY COMPANY,

                            Defendant-Appellee-Cross
                            Appellee and Cross-
                            Appellant,

                versus

ALLEN GODFREY LEE AND LLOYD'S OF LONDON,

                            Defendants-Appellees-Cross
                            Appellees,

                versus

PACIFIC EMPLOYERS INSURANCE COMPANY,

                            Defendant-Third Party
                            Plaintiff-Appellee-Appellant
                            and Cross-Appellee,

and

FIREMAN'S FUND INSURANCE,

Defendant-Appellee-Appellant
and Cross-Appellee,

and

PREFERRED RISK MUTUAL INSURANCE COMPANY,

Defendant-Appellee-Appellant
and Cross-Appellee,

and

CENTENNIAL INSURANCE COMPANY,

Defendant-Appellee,

versus

HOUSTON GENERAL INSURANCE COMPANY,

Defendant-Appellant-Cross-
Appellee and Appellee,

LOUISIANA COMPANIES, INC.,

Third Party Defendant-
Appellee.

_____

Appeal from the United States District Court for
the Western District of Louisiana
_____

(July 15, 1994)

Before REAVLEY, GARWOOD and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

Two pedophilic priests of the Diocese of Lafayette[1] molested

thirty-one children over a period of seven years, prompting a

---

[1] The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. and the Diocese of Lake Charles, Inc. are both appellants in this appeal. At oral argument the parties indicated that one Diocese is the successor of the other, so we will refer to the appellants as "the Diocese."

spate of claims from the children and their parents.  The Diocese and its insurance carriers, unable to compromise on the allocation of loss under the "occurrence" policies, settled the claims against the Diocese with contributions on a pro rata basis (using years of coverage as a benchmark) and agreed to let a court decide their coverage dispute.  The Diocese filed a declaratory judgment action in state court, which was removed upon diversity jurisdiction to federal court.  The parties then submitted motions for summary judgment, and the court granted summary judgment on all claims.  We affirm in part, reverse in part, and remand.

## I. Background

The sordid picture underlying this insurance coverage dispute is that of two miscreant priests who subjected thirty-one children to extended periods of sexual molestation.  These molestations began in August of 1976 and ended in June of 1983. The record on appeal does not show how many times each child was molested, nor the extent of damage resulting from each encounter. The parties, however, have stipulated to the dates when the molestations began and ended for each child (the "grid").[2]  And

---

[2]      Represented as uncontested facts, Lloyd's of London presented a grid, along with its motion for summary judgment, listing when each child's molestation began and ended.  On appeal, Houston General Insurance Company does not contest its accuracy, though it once did. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.") (emphasis omitted).  Pacific Employers' Insurance Company argues that the dates of child molestation are disputed fact questions.  But because Pacific failed to contest the grid under the district court's local rules, it has waived any objection it may have had to the grid. *Local Rule 2.10* ("Opposition to Summary Judgment. ... All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.").

during oral argument, the parties further agreed that each child was molested at least once during each stipulated year of molestation.

## A. *The Insurance Policies*

The complexity of this case arises from the different periods of the Diocese's insurance coverage, primary and excess. Fireman's Fund Insurance Company was the primary carrier from 1975 to 1978, and Preferred Risk Mutual Insurance Company covered the Diocese from 1978 through July 1981. Houston General Insurance Company was the excess carrier from 1975 to 1979, and Pacific Employers' Insurance Company was the succeeding excess carrier through July 1981.

In July 1981, the Diocese switched its coverage to a form of limited self-insurance. Under this self-insurance plan, the Diocese presented the first layer of coverage by contributing $400,000 to a yearly loss fund, from which the Diocese was responsible for the first $100,000 of each occurrence. Lloyd's of London's excess aggregate policy, with a $450,000 aggregate limit, offered the next layer of coverage.[3] And Interstate Fire & Casualty's $5 million umbrella policy provided the excess coverage.[4]

---

[3] Centennial Insurance Company, also a party to this appeal, participated in 20% of the Lloyd's policy. It did not issue a separate policy insuring the Diocese.

[4] From the parties' appellate briefs, we are unable to determine exactly how the loss fund, the excess aggregate policy, and the excess policy interact. While this does not affect our analysis, the district court will have to determine the structure of this self-insurance plan before it can enter a final judgment.

All insurance policies are "occurrence" based policies, meaning their limits of coverage are capped on a per occurrence basis. Under such a policy, it is the date of the occurrence, and not the date of the claim, that determines coverage. When bodily injury results from an occurrence during a policy period, coverage is triggered. This coverage extends to all resulting damages – both present and future – emanating from the injury. The policy does not, however, cover bodily injury occurring outside the policy period.

Because the insurance companies and the Diocese could not agree on the proper definition of "occurrence," they opted to settle the molestation claims among themselves on a pro rata basis and leave the proper allocation of loss to the court. Accordingly, the Diocese filed a declaratory judgment action in state court, which was removed to federal court on diversity grounds. Decision of the issues affect either the allocation of loss between successive primary carriers and the Diocese or between primary and excess carriers.

B. *The District Court's Opinion*

   1. *Occurrence and First Encounter*

The district court relied on *Interstate Fire & Casualty Co. v. Archdiocese of Portland*, 747 F. Supp. 618 (D. Or. 1990) to conclude that "occurrence" should be defined on a per child basis, with all subsequent molestation treated as injury resulting from that "occurrence." With thirty-one children

5

molested, the court reasoned that there were thirty-one occurrences. It also considered the parents' claims as arising from the same "occurrences," meaning that the parents' injuries did not constitute separate occurrences under the policies. The court allocated the loss using the "first encounter rule": the insurance carrier covering the Diocese during the occurrence of the first molestation of each child was responsible for all resulting damages to that child (and his parents), including damages from molestations occurring after the expiration of that carrier's policy.[5]

Depending upon their interests, all parties appeal from the court's judgment. Some disagree with the court's definition of "occurrence"; others contest the court's use of the first encounter rule.

*2. The Diocese's Claim Against Gallagher and Bassett*

The Diocese sued Arthur J. Gallagher & Company, the insurance agent that procured the self-insurance program, alleging that Gallagher failed to provide full coverage above the loss fund as warranted. The court granted Gallagher's motion for summary judgment, and the Diocese appeals.

The Diocese also sued Gallagher Bassett Services Inc., the administrator of the self-insurance plan, claiming that Bassett breached its obligation to properly administer the plan by

---

[5] The parties submitted nine other molestation claims to arbitration, and the district court held the arbitration binding. No party contests this ruling on appeal.

refusing to contribute money from the loss fund toward the settlement of molestation claims arising before 1981.  The court granted Bassett's motion for summary judgment, and the Diocese appeals.

   *3. Pacific's Claim Against Louisiana Companies*

   Pacific, an excess carrier, sued its insurance agent, Louisiana Companies, alleging that Louisiana Companies misrepresented the Diocese's underlying primary coverage as $500,000 per year, when it was actually a three-year policy with a $500,000 per occurrence limit (Preferred's policy).  With "occurrence" defined on a per child basis and with liability allocated under the first encounter rule, the court concluded that Pacific suffered no prejudice from the alleged misrepresentation and granted Louisiana Companies' motion for summary judgment.  Pacific appeals.

**II. Analysis**

*A.  Allocation of Loss Under the Insurance Policies*

   With the claims by the children and their parents settled, we must determine the proper allocation of loss among the insurance companies and the Diocese.  Because this declaratory judgment action is based upon diversity jurisdiction, we apply Louisiana law in interpreting the insurance policies.

*1. Defining "Occurrence"*

*a. The Children's Claims*

What constitutes an "occurrence" is central to this appeal because each policy's limits of liability are on a per occurrence basis; the larger the number of "occurrences," the greater the loss borne by the primary insurers and the Diocese.  The Lloyd's policy is representative of the other policies involved in both its scope of coverage and its definition of "occurrence":

> Underwriters hereby agree ... to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon the Insured by law ... for damages ... on account of personal injuries ... arising out of any occurrence happening during the period of the Insurance.

> The term "occurrence" wherever used herein shall mean an accident or a happening or event or *a continuous or repeated exposure to conditions* which unexpectedly and unintentionally result in personal injury, or damage to property during the policy period. All such exposure to *substantially the same general conditions* existing at or emanating from one location shall be deemed one occurrence. (emphasis added).

The definition of "occurrence" affords little assistance because "a continuous or repeated exposure to conditions" and "substantially the same general conditions" are malleable.  An "occurrence" could be the church's continuous negligent supervision of a priest, the negligent supervision of a priest with respect to each child, the negligent supervision of a priest with respect to each molestation, or each time the Diocese became aware of a fact which should have led it to intervene, just to

8

name a few possibilities.[6]  The meaning of "occurrence," as used in the insurance policies, can be perplexing in application. *Cf. Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1222 (6th Cir. 1980), *cert. denied*, 454 U.S. 1109 (1981).   When a term in an insurance policy has uncertain application, Louisiana courts interpret the policy in favor of the insured. *See Hebert v. First Am. Ins. Co.*, 461 So. 2d 1141, 1143 (La. Ct. App. 1984), *writ denied*, 462 So. 2d 1265 (La. 1985).

While there are many possible applications of the term "occurrence," we are not without guidance.  In *Lombard v. Sewerage & Water Bd. of New Orleans*, 284 So. 2d 905 (La. 1973), where the ongoing construction of a drainage canal damaged many adjacent property owners, the Louisiana Supreme Court discussed the proper method for determining an "occurrence" when the cause of harm continues to injure different persons:

> The word "occurrence" as used in the policy must be construed from the point of view of the many persons whose property was damaged. As to each of these plaintiffs, the cumulated activities causing damage should be considered as one occurrence, though the circumstances causing damage consist of a continuous or repeated exposure to conditions resulting in damage arising out of such exposure. Thus, when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Notwithstanding, therefore,

---

[6]     We have couched the underlying tort in language of negligent supervision, assuming that the Louisiana Supreme Court would not consider the priests' actions to be within the scope of their employment, nor would it consider the molestations a "risk of harm fairly attributable to the employer's business." *See Roberts v. Benoit*, 605 So. 2d 1032, 1040-41 (La. 1991); *McClain v. Holmes*, 460 So. 2d 681, 683-84 (La. Ct. App. 1984), *writ denied*, 463 So. 2d 1321 (La. 1985).  But even if the Diocese is liable for the priests' intentional acts under a respondeat superior theory, *see Miller v. Keating*, 349 So. 2d 265, 268-69 (La. 1977), such liability does not affect our decision on what constitutes an "occurrence" or the number of occurrences suffered by each child.

> that the same causes may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence, but the damage to each plaintiff is a separate occurrence.

*Id*. at 915-16. Following *Lombard*, "the damage to each [child] is a separate occurrence." *See also Interstate*, 747 F. Supp. at 624 ("Each time this negligent supervision presented Father Laughlin with the opportunity to molest a different child, the Archdiocese was exposed to new liability," which constitutes an "occurrence" under the policy language.); *Murice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206 (5th Cir. 1971) (holding that the liability creating event constitutes an "occurrence").

### b. The Parents' Claims

Interstate argues that the injuries suffered by the children's parents are separate "occurrences" under the policies. In its brief, Interstate launches a flotilla of Louisiana cases showing that the parents have a direct cause of action against the church for their injuries, but Interstate misses the mark. Whether the parents' claims are direct under Louisiana law is not relevant. The issue is whether, under the policy language, the parents' injuries are derivative of an "occurrence." If the children had not been molested, the parents would have gone unharmed. Thus, the parents' injuries do not amount to separate "occurrences" under the policies. *See Crabtree v. State Farm Ins. Co.*, 632 So. 2d 736, 738 (La. 1994) (finding that while the wife's claim for mental anguish constituted "bodily injury"

separate from that suffered by her husband, entitling her to a separate "per person" limit of coverage, her claim was nevertheless subject to the "per accident" limit in the policy); *Lantier v. Aetna Casualty & Sur. Co.*, 614 So. 2d 1346, 1357 (La. Ct. App. 1993) (concluding that spouses' wrongful death suits were derivative of a single "occurrence"); *Geico v. Fetisoff*, 958 F.2d 1137, 1143 (D.C. Cir. 1992) (holding that while a spouse may have a legally independent claim for loss of consortium, it is nevertheless derivative of the "occurrence" under the policy language).

*2. The Number of "Occurrences" Per Child*

While *Lombard* instructs that the molestation of each child is a separate occurrence, it does not answer the question of how many "occurrences" each child suffered, because the issue of multiple occurrences during successive policy terms never arose. The court's opinion in *Davis v. Poelman*, 319 So. 2d 351 (La. 1975) is equally unhelpful because it dealt with a single injury resulting in continuing damage over a period of time. It did not address a situation where an individual was repeatedly injured during multiple policy terms.

The most applicable line of Louisiana cases dealing with multiple injuries during successive years are the asbestosis cases.[7] *See e.g., Cole v. Celotex Corp.*, 599 So. 2d 1058 (La.

---

[7] The district court refused to follow the asbestos cases because under these stipulated facts, the time of injury is certain. True, the courts dealing with the asbestos cases wrestled with the issue of when bodily injury occurred: was the employee injured when he inhaled asbestos fibers (the exposure rule), or was the employee

11

1992); *Houston v. Avondale Shipyards, Inc.*, 506 So. 2d 149 (La. Ct. App.), *writ denied*, 512 So. 2d 460 (La. 1987); *Ducre v. Mine Safety Appliances Co.*, 645 F. Supp. 708 (E.D. La. 1986) (applying Louisiana law), *approved*, 833 F.2d 588 (5th Cir. 1987); *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.) (applying Louisiana law), *cert. denied*, 454 U.S. 1109 (1981).  In *Cole*, the most recent Louisiana Supreme Court decision in this area, the court answered the question of how to determine the number of occurrences when the victim is repeatedly injured during multiple policy years.  Adopting the exposure rule, the court concluded that the inhalation of asbestos fibers causes bodily injury as defined in the "occurrence" policies.  The court held that an employee suffered bodily injury from an occurrence when the employee inhaled asbestos fibers during a policy year and all subsequent inhalation during that year arose out of the same occurrence.  When the employee inhaled asbestos during the next policy year, again, the employee suffered bodily injury from an occurrence.  Thus, each employee suffered injury from an occurrence during each year in which he inhaled asbestos. *Cole*, 599 So. 2d at 1075-80.

We believe the Louisiana Supreme Court would apply the same analysis to the stipulated facts of this case.  When a priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage.  All

injured once asbestosis manifested itself (the manifestation rule)?  But the court overlooked the similarity, based upon this record, concerning the indivisibility of the injury.  The asbestos cases provide significant direction regarding the number of occurrences when a victim suffers repeated injuries during multiple policy years.

12

further molestations of that child during the policy period arose out of the same occurrence. When the priest molested the same child during the succeeding policy year, again there was both bodily injury and an occurrence. Thus, each child suffered an "occurrence" in each policy period in which he was molested. *See Diocese of Winona v. Interstate Fire & Casualty Co.*, 841 F. Supp. 894, 898-99 (D. Minn. 1992) (accepting that the church's negligent supervision of a priest can constitute an occurrence during each policy period in which a child was molested); *Cole*, 599 So. 2d at 1075-80 (holding that policy coverage is triggered in each year that the plaintiff inhaled asbestos); *Houston*, 506 So. 2d at 150 ("It is reasonable to conclude that each year during which plaintiff was exposed, he suffered additional injury for which there may be liability which triggers [the insurer's] risk exposure under each of its policies in effect during plaintiff's exposure."); *Ducre*, 645 F. Supp. at 713 ("Thus, this Court concludes that liability under the [insurer's] insurance policies shall be determined on a yearly basis, and that [the insurer] is on the risk for each plaintiff asserting a claim, for each policy period during which the plaintiff was exposed to silica dust."); *Porter*, 641 F.2d at 1145; *Forty-Eight Insulations*, 633 F.2d at 1226.

In the case of Preferred and Fireman's Fund, both of which issued a three-year occurrence policy, the analysis is the same.[8]

---

[8] This is an issue of first impression in Louisiana. While the courts have dealt with multi-injury, multi-policy cases, they have never addressed a situation where some of the policies last for more than one year. *See e.g.*, *Cole*, 599 So. 2d at 1074 n.47 (involving thirty-three one-year policies); *Houston*, 506 So. 2d at 150, 154

For each child who was molested while either of these carriers was on the risk, coverage was triggered. All subsequent molestations during the policy period constitute "repeated exposure to conditions which unexpectedly ... result in personal injury." (The "condition" is the Diocese's negligent supervision of the priest during the policy period). Houston General argues that the carriers issuing three-year policies should bear the same burden as if they had issued three one-year policies, thus allocating the loss on a per year basis. Not only does this ignore policy language, but it is also inconsistent with the intent of the parties. Clearly, a three-year "occurrence" policy provides less coverage than three one-year policies, because an occurrence could last longer than one year. While an insurance policy should be interpreted in favor of the insured, we see no justification for providing more insurance coverage than the insured bargained for. *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 420 (La. 1988) ("[C]ourts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language.").

We reject the district court's use of the first encounter rule for the following reasons. First, and foremost, it flouts the policy language. The insurance policies all excluded bodily injury occurring outside of the policy period. The district court, and Lloyd's in oral argument, failed to recognize the

(involving one-year policies, except for one six-month policy).

14

distinction between the future damages resulting from a molestation and the subsequent injurious acts of molestation. All the policies cover consequential damages resulting from a molestation. However, a subsequent molestation, occurring outside the policy period, is not a consequential damage of the previous molestation; it is a new injury, with its own resulting damages. Second, under these facts, the first encounter rule would prevent insurance companies from limiting their coverage to damages emanating from molestations taking place during their policy period. And third, the first encounter rule is an inequitable administrative rule. The first encounter rule would deny coverage to a child who was molested a day before the Diocese procured insurance coverage, even though separate molestations continued through the policy year and beyond.

By allocating the loss according to the language of the insurance policies, we avoid the shortcomings of the reductive first encounter rule. Each carrier is responsible, up to its occurrence limits, for all damages emanating from molestations that occur during the insurer's policy period. All molestations occurring outside a carrier's policy are covered by the insurer on the risk at the time of the molestation. This approach maximizes coverage for the insured and allocates the loss according to the policy language.

If the number of molestations were known and the damages from each molestation proved, we could allocate the loss according to the actual injury suffered by each child during each

policy period.  It may be that a child's psychological injury wrought by prolonged molestations during Preferred's three years of coverage dwarfs the injury emanating from later molestations during the time the Diocese was self-insured.  If that were the case, Preferred would bear a significantly larger amount of the loss than would the Diocese, Lloyd's and Interstate. Unfortunately, there is no measure of the amount of damage caused by the molestations during any given policy period.  This leaves us with only one avenue under the policies' language, which is to allocate the loss based upon the policy periods.  Thus, the loss is apportioned according to the percentage of the time or period of each child's molestation occurring during each carrier's policy period.

B.  *Diocese v. Gallagher & Diocese v. Bassett*

*1. Diocese v. Gallagher*

In Gallagher's self-insurance proposal, it stated that the Diocese would be "fully insured" for all losses above the loss fund.  Gallagher, however, failed to mention that once Lloyd's reached its excess aggregate limit of $450,000, the Diocese would again be obligated to make payments toward the occurrence claims before Interstate's excess policy kicked in.[9] The Diocese, stunned by this gap in coverage, filed suit against Gallagher. While the Diocese filed within the ten-year prescriptive period for a contractual claim, it missed the one-year period for a

---

[9]     Again, the amount of the Diocese's exposure after the exhaustion of Lloyd's excess aggregate policy is unclear.  The district court can resolve this issue on remand.

16

delictual claim. Thus, the Diocese's suit against Gallagher will rise or fall on the nature of its claim.

An insured's claim against its insurance agent is contractual only when the agent expressly warrants a specific result; otherwise, it is delictual. *Roger v. Dufrene*, 613 So. 2d 947, 949 (La. 1993). In *Roger*, the insured, Crewboats, Inc., told its agent "to provide full coverage for Crewboats, Inc. under all circumstances." *Id.* at 950. But when a Crewboats' employee, using his own vehicle for business purposes, injured another motorist in a collision, Crewboats found a gaping hole in its "full coverage ... under all circumstances." To its chagrin, Crewboats discovered that it was on the hook for the motorist's claim because its automobile policy did not include an endorsement covering employee-owned vehicles used for business purposes. In an attempt to lessen the sting, Crewboats filed a third-party claim against its agent, but because the prescriptive period for a delictual claim had passed, it was forced to argue that its claim was contractual. On appeal, the Louisiana Supreme Court dismissed Crewboats' third-party claim, holding that the claim was delictual because the insurance agent did not specifically warrant that insurance coverage for employee-owned vehicles would be obtained. *Id.*

The Diocese argues that Gallagher warranted a specific result when it told the Diocese: "If the [Loss] Fund is exhausted, the Diocese[] becomes fully insured." Following *Roger's* lead, the issue is whether Gallagher specifically

17

warranted the amount of the Diocese's coverage, and we conclude that it did.  Indeed, we find it difficult to see how Gallagher could have been more specific.  The Diocese's claim is contractual because Gallagher specifically stated that the loss fund capped the Diocese's potential yearly exposure, which it certainly did not.

### 2. Diocese v. Bassett

The Diocese alleges that Bassett, the administrator of the self-insurance plan, breached its obligation to properly administer the plan by refusing to contribute money from the loss fund toward the settlement of molestation claims arising before July 1981, when the self-insurance program began.  The Diocese has offered no summary judgment evidence supporting any breach of duty.  Bassett refused to allocate loss fund monies toward molestation claims arising before 1981 because those claims were not covered by the insurance policies it was administering.

## C.  Pacific v. Louisiana Companies

Pacific, an excess carrier, sued its insurance agent, Louisiana Companies, alleging that the agent failed to inform Pacific that Preferred's policy (the underlying primary insurance policy) was a three-year policy instead of a one-year policy. Because of the alleged omission, Pacific believed Preferred's coverage to be $500,000 per year, instead of $500,000 per occurrence for three years.  Based upon our analysis above,

18

Preferred's coverage is $500,000 per occurrence per policy period.  Thus, the court erred when it granted Louisiana Companies' motion for summary judgment.

*D.  Interest*

The district court awarded interest, but failed to state when it should begin to run.  Some parties argue that only post-judgment interest should be awarded, but because we reverse and remand for reallocation of the loss, there is no post-judgment interest. The only other contention on interest charge is Interstate's argument that Pacific should be responsible for prejudgment interest to the extent that it failed to fully participate in the settlement of the molestation claims, and we agree. *See Trustees of the Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 908-09 (3d Cir. 1987); *Mini Togs Products, Inc. v. Wallace*, 513 So. 2d 867, 872-75 (La. Ct. App.), *writ denied*, 515 So. 2d 447 (La. 1987).

### III. Conclusion

When a child was first molested during a policy period, there was an occurrence triggering coverage.  All subsequent molestations of that child during the policy period, as well as the resulting injury to the child's parents, arose out of that same occurrence.  Damages are attributed equally to the occurrence of molestations within the respective policy periods, and the loss is allocated according to the percentage of the time or period of each child's molestation occurring during each insurer's policy period.

We AFFIRM the court's judgment in favor of Bassett; the judgment is otherwise REVERSED.  We REMAND the case to the district court for further proceedings consistent with this opinion.

AFFIRMED in Part; REVERSED in Part and REMANDED.