[Nos. E013768, E013426, E014026. Fourth Dist., Div. Two. Aug. 30, 1996.]

CALIFORNIA CASUALTY INSURANCE COMPANY, Plaintiff and Appellant, v.
NORTHLAND INSURANCE COMPANY et al., Defendant and Respondent.

CALIFORNIA CASUALTY INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v.
MEMORIE YESSIAN, Defendant, Cross-complainant and Appellant.

MEMORIE YESSIAN, Cross-complainant and Appellant, v.
ALLSTATE INSURANCE CO., Cross-defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts II.A.1.b., II.A.1.c., II.A.2., II.B.1.b., II.B.1.c., II.B.2., II.B.3, II.C., II.D. and II.E.

1686

**COUNSEL**

David C. Werner and James B. Abeltin for Plaintiff and Appellant and for Plaintiff, Cross-defendant and Respondent.

Steven W. Murray for Defendant, Cross-complainant and Appellant and for Cross-complainant and Appellant.

Parker & Stanbury, Stephen H. Osborn and Gorman J. DeGrave for Defendant and Respondent.

Sonnenschein, Nath & Rosenthal, Ronald D. Kent and Charles W. Hokanson for Cross-defendant and Respondent.

## OPINION

**RICHLI, J.**—Memorie Yessian (Yessian) obtained a judgment against Mr. and Mrs. Joe Harmer for personal injuries sustained in a boating accident involving the Harmers' Yamaha Waverunner. Yessian sought to enforce her judgment, and to assert claims assigned to her by the Harmers, against two of the Harmers' insurers, California Casualty Insurance Company (CCIC) and Allstate Insurance Co. (Allstate). The lower court granted summary judgment for the insurers, concluding neither CCIC's nor Allstate's policy covered Yessian's injuries. Yessian appeals.

We agree with the lower court that neither policy covered Yessian's claims. CCIC's policy expressly excluded liability arising from the use of a watercraft with inboard motor power. It was undisputed the Waverunner was a watercraft with an inboard engine. We reject Yessian's argument that because the Waverunner was propelled by a jet pump rather than a propeller, it was not an "inboard motor power watercraft" despite the location of its engine.

Allstate's policy covered the Harmers' 18-foot Donzi waterski boat, not the Waverunner. Although it also covered dinghies or tenders "used to service" the Donzi, the Waverunner was not being used for that purpose when the accident occurred. We reject Yessian's argument that because the Harmers had used the Waverunner in conjunction with the Donzi on other occasions, the Waverunner was covered as a dinghy or tender regardless of how it was being used when the accident occurred.

I

### FACTUAL AND PROCEDURAL BACKGROUND

Yessian was seriously injured in a collision between a Kawasaki Jet Ski, which she was operating, and the Waverunner, which Mr. Harmer was

operating and on which Mrs. Harmer was riding. The collision occurred on April 12, 1990, on the Colorado River near Bullhead City, Arizona.

The Harmers were insured by CCIC, Allstate and Northland Insurance Company (Northland). CCIC's policy was a homeowners policy which provided liability coverage up to $100,000 but excluded liability arising from the use of a watercraft with inboard or inboard-outdrive motor power. Allstate's policy provided liability coverage for the Donzi, and for watercraft used to service the Donzi, up to $300,000. Northland's policy, which the Harmers purchased specifically to cover the Waverunner, provided liability coverage for the Waverunner up to $15,000.

CCIC began investigating the accident shortly after it occurred. On January 31, 1991, CCIC advised the Harmers it was denying coverage, based on the watercraft exclusion.

## A. *The Underlying Personal Injury Action*

On April 1, 1991, Yessian sued the Harmers for personal injuries. On April 12, 1991, Yessian's husband, Jerry Yessian, filed a separate action against the Harmers for negligent infliction of emotional distress and loss of consortium. The actions were consolidated. Northland defended the Harmers in both actions.

On July 18, 1991, the Harmers tendered the defense and indemnity of the Yessians' actions to Allstate. On October 4, 1991, Allstate advised the Harmers there was no coverage for the actions, because the Waverunner was not a covered watercraft under the Allstate policy.

Effective October 18, 1991, the Harmers agreed to stipulate to a judgment in favor of Yessian for $792,000, and in favor of Mr. Yessian for $88,000. The Yessians agreed to enforce the judgment, except for $10,000, only against proceeds from the CCIC and Allstate policies. The Harmers assigned to the Yessians any claims they had against CCIC or Allstate for not defending or indemnifying the Harmers.

On November 15, 1991, CCIC advised the Harmers that if Northland failed to provide a defense to the Yessians' actions, CCIC would do so under a reservation of rights.

The Yessians and Harmers stipulated to a judgment as they had agreed. The Yessians filed an ex parte application for entry of judgment pursuant to the stipulation. Judge Davis of the lower court signed the judgment and it was filed December 19, 1991.

### B. *CCIC's Declaratory Relief Action*

On May 31, 1991, while Yessian's personal injury action was pending, CCIC filed a separate action for declaratory relief, naming as defendants the Harmers, Yessian, Northland and Allstate. The present appeals emanate from that action. CCIC sought a declaration that its policy did not cover Yessian's claims, and that Northland's and Allstate's policies did.

On April 16, 1992, Yessian answered CCIC's complaint and filed separate cross-complaints against CCIC and Allstate.[1] On August 4, 1992, Yessian amended the cross-complaints. As amended, each cross-complaint alleged the same seven causes of action: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) enforcement of the stipulated judgment pursuant to Insurance Code section 11580, subdivision (b)(2); (4) declaratory relief (duty to defend); (5) declaratory relief (duty to indemnify); (6) breach of contract; and (7) breach of covenant of good faith and fair dealing. Yessian asserted causes of action (1) and (2) as the Harmers' assignee, alleging the insurers breached the policies and acted in bad faith by failing to defend and indemnify the Harmers. Causes of action (4) and (5) sought declarations that the insurers were obligated to defend and indemnify the Harmers. Yessian asserted causes of action (6) and (7) as a third party beneficiary of the policies, alleging the insurers breached the medical payments provisions of the policies, and acted in bad faith, by failing to pay her medical expenses.

### C. *Summary Judgment for CCIC*

On April 13, 1993, CCIC moved for summary judgment on its declaratory relief complaint and on Yessian's cross-complaint, on the ground CCIC had no duty to indemnify or defend the Harmers. CCIC argued the Waverunner was a watercraft with inboard motor power and therefore fell within the policy's watercraft exclusion. Yessian argued the Waverunner was not an "inboard motor power watercraft" because it was propelled by a jet pump rather than a propeller. Judge Wade of the lower court ruled the Waverunner was subject to the exclusion, and granted the motion.

### D. *Summary Judgment for Allstate*

On February 5, 1992, Allstate moved for summary judgment on CCIC's complaint. Allstate argued its policy expressly covered only the Donzi, not

---

[1]Mr. Yessian and the Harmers also were listed as cross-complainants. Because those parties did not appeal, we discuss only the claims asserted by Yessian herself.

the Waverunner. Yessian opposed the motion, arguing there was a triable fact issue whether the Waverunner was covered as a dinghy or tender for the Donzi. Judge Krug of the lower court agreed with Yessian, and denied Allstate's motion. Allstate petitioned for interlocutory review, which we summarily denied.

On September 7, 1993, Allstate made a second motion for summary judgment. Allstate argued that even if the Waverunner had been used as a dinghy or tender to service the Donzi on other occasions, it was not covered because it was not being used in that manner on the day of the accident. Judge Wade agreed and granted Allstate's motion.

### E. Summary Judgment for Northland

On April 8, 1993, Northland moved for summary judgment on CCIC's declaratory relief complaint, on the ground there was no actual controversy between CCIC and Northland because Northland had acknowledged coverage and paid its policy limits. Judge Wade granted the motion.

### F. Matters on Appeal

Yessian filed separate appeals from the summary judgments for CCIC and Allstate. CCIC separately appealed the summary judgment for Northland. We consolidated the three appeals in view of the common issues of law and fact.

### II

### DISCUSSION

### A. Yessian vs. CCIC

#### 1. Coverage

##### a. Watercraft Exclusion

CCIC's policy provided the Harmers with liability coverage for accidental bodily injury or property damage to a third party. It excluded, however, liability for injury "arising out of . . . the ownership, maintenance, use, loading or unloading of a watercraft . . . with inboard or inboard-outdrive motor power owned by any insured . . . or powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an insured." The question is whether the Waverunner was a

watercraft "with inboard or inboard-outdrive motor power" within the meaning of the exclusion.

The Waverunner was powered by an engine located inside its hull. It was propelled by a jet pump which expelled a stream of water through a nozzle. It was steered by a steering wheel which controlled the direction of the nozzle. It had no drive shaft or propeller. At the time the Harmers purchased the CCIC policy, Waverunners did not exist.

Yessian does not dispute that the Waverunner had an inboard engine. She argues, however, that the exclusion does not apply to all watercraft with inboard engines, but only to those with inboard "*motor power*." She asserts that "inboard motor power" must be interpreted to refer to something more than the location of the engine, or the words "motor power" are superfluous. Specifically, she concludes, an "inboard motor power watercraft" must have not only an inboard motor, but also "a transmission and gears, with a shaft, which is connected through the hull to a propeller, which is supported beneath the hull with a strut. . . . Such a watercraft is steered by use of a rudder . . . ."

■ The Supreme Court recently stated: "[I]nterpretation of an insurance policy is a question of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) In an earlier decision, the court observed that ". . . words in an insurance policy must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the policy language." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].)

We would have to disregard these principles to embrace Yessian's interpretation of the watercraft exclusion. ■ The plain meaning of the words "watercraft . . . with inboard . . . motor power," read in their ordinary sense, is "a watercraft powered by an inboard motor." As stated, Yessian concedes the Waverunner was powered by an inboard motor. There can be no dispute the Waverunner was a watercraft. It follows, necessarily, that the Waverunner was a "watercraft . . . with inboard . . . motor power" subject to the exclusion. To imply an additional requirement that the Waverunner have a transmission, shaft, propeller and rudder, when the plain words of the policy, read in their ordinary sense, impose no such requirement, we would have to indulge in precisely the kind of strained interpretation the Supreme Court has forbidden us to adopt. ■ Although coverage exclusions are to be strictly construed, " '[w]e may not, under the guise

of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid.' " (*Suarez* v. *Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1403 [254 Cal.Rptr. 377], quoting *Safeco Ins. Co.* v. *Gilstrap* (1983) 141 Cal.App.3d 524, 532-533 [190 Cal.Rptr. 425].)

■ Contrary to Yessian's assertion, interpretation of the exclusion to apply to all watercraft with inboard engines does not render the words "motor power" surplusage. Those words are necessary to make the language intelligible. If they were eliminated, the policy would exclude "watercraft . . . with inboard or inboard-outdrive owned by any insured," which makes no sense. The fact the words "motor power" were included therefore does not imply they were intended to impose some requirement in addition to the requirement that the watercraft have an inboard engine.

We also are not persuaded by Yessian's argument that if the reference to watercraft with "inboard . . . motor power" includes any watercraft with an inboard engine, the additional policy language excluding watercraft with "inboard-outdrive motor power" is surplusage. As one of the authorities cited by Yessian indicates, an inboard-outdrive watercraft (also called an "inboard-outboard" craft) does have an engine mounted inboard, that is, inside the hull. However, it differs from an "inboard" watercraft in that the drive unit is outboard, and turns as a unit for steering. (*Martenson* v. *Massie* (1973) 113 N.H. 18 [304 A.2d 372, 373-374].) Thus, the court in *Martenson* held an exclusion covering boats with "inboard motor power" did not apply to a watercraft powered by an inboard-outboard motor. (*Id.*, at p. 374.)

Although there is also later authority holding an exclusion for "inboard motor power" watercraft *does* apply to inboard-outdrive craft (*Green* v. *Merrill* (1975) 293 Ala. 628, 632 [308 So.2d 702, 704-705]), in view of the conflicting authority, CCIC was well advised to refer specifically to "inboard-outdrive" craft even if the exclusion for "inboard" watercraft should have been enough by itself to include both inboard and inboard-outdrive craft. It cannot reasonably be inferred, therefore, that because the exclusion referred to both types of watercraft, the reference to "inboard motor power" watercraft was intended to mean something other than a watercraft powered by an inboard motor. Certainly, there is no basis for inferring an intent to exclude *only* watercraft having a transmission, drive shaft, propeller and rudder, as Yessian would have us do.

Yessian focuses on language from *Martenson* v. *Massie, supra,* in which the court stated: "The inboard motor is usually located about a third of the way up from the stern toward the bow and supplies power to the propeller

through a transmission and a propeller shaft which runs through the bottom of the boat and is supported by a strut. Steering is by a separate rudder." (304 A.2d at p. 373.) *Martenson*, however, involved a propeller-driven boat, not one powered by a jet pump. The context of the court's discussion therefore assumed all three of the types of watercraft it described—inboard, inboard-outboard and outboard—were powered by propellers. We do not infer an intent to hold that a watercraft which has an inboard engine but not a propeller does not have "inboard motor power."

Indeed, in describing the various arrangements, the *Martenson* court began by observing that "there are three types of motors for boats." (304 A.2d at p. 373.) It then described each type in terms of engine location and arrangement of drive shaft and propeller. Under Yessian's reading of the decision, because a Waverunner has no drive shaft or propeller, it cannot be considered a "boat" powered by a "motor" at all. We decline to adopt a construction so at odds with the ordinary meaning of the words used. (See 74 Ops.Cal.Atty.Gen. 174, 176 (1991) [jet pump powered personal watercraft is a "boat" for purposes of Harbors and Navigation Code].)

Furthermore, an exclusionary clause cannot be construed "in the abstract, without regard to its intended function in the policy." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra,* 41 Cal.3d at p. 916.) The exclusion here was carefully drawn to exclude inboard, inboard-outdrive, and outboard motor power craft, except those with outboard motors of 25 horsepower or less. The obvious purpose of the exclusion was to exclude liability for *all* watercraft, except those specifically covered.

Yessian also cites *Lantier* v. *Aetna Cas. & Sur. Co.* (La.Ct.App. 1993) 614 So.2d 1346, in which the court held a provision which, like CCIC's, excluded watercraft "with inboard or inboard-outdrive motor power" was ambiguous. In *Lantier*, however, the watercraft was an airboat with a motor which was *within* the spatial boundaries of the hull when viewed from above but *above* the hull when viewed from the sides, front or rear. The court held the exclusion reasonably could be construed either to cover or not to cover such a watercraft, because the engine could be considered to be located either inboard or not inboard, depending on the viewer's perspective. Therefore, finding the exclusion ambiguous, the court construed the policy to provide coverage. (*Id.,* at p. 1355.)

Here, as stated, there is no dispute the Waverunner's engine was located inboard. Thus, *Lantier* does not support Yessian's position. In fact, by focusing exclusively on the physical location of the engine, and not on the means of propulsion, *Lantier* actually undermines Yessian's argument that engine location by itself is not determinative.

Additionally, even if we assume the exclusion may be ambiguous in some factual contexts, it does not follow it is ambiguous in all contexts. To the contrary, "language in a contract must be construed . . . in the circumstances of that case, and cannot be found to be ambiguous in the abstract." (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.*, *supra*, 41 Cal.3d 903, 916, fn. 7.) Thus, in *Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114 [253 Cal.Rptr. 833], the court stated: "Plaintiff argues that because other courts have found similar exclusions to be ambiguous, . . . therefore more than one reasonable interpretation must exist. We fail to see the logic of the argument as presented. [¶] Disagreement concerning the meaning of a phrase does not automatically make the policy ambiguous." (*Id.*, at p. 1120.)

Here, unlike the situation in *Lantier*, the Waverunner's engine could not reasonably be viewed as either an inboard or not an inboard motor, depending on the perspective. Consequently, the exclusion was not ambiguous in this case, notwithstanding *Lantier*'s finding of ambiguity on the facts present there.

Finally, we are not persuaded by Yessian's argument that if it wanted to exclude jet pump powered watercraft, CCIC should have updated its policy to refer to them specifically when they became available. In *State Farm Fire & Cas. Co.* v. *Johnson* (Fla.Dist.Ct.App. 1992) 596 So.2d 1162, the court held an exclusion of liability for injury arising from the use of a "jet ski or similar type of craft," applied to a Waverunner even though it differed somewhat from a Jet Ski. Noting that when the policy was written only Jet Skis and not Waverunners were in existence, the court rejected the assertion the insurer should have amended the policy to exclude "personal watercraft," a term broad enough to include Waverunners. (*Id.*, at pp. 1162-1164.)

Although it might have promoted clarity in CCIC's policy to state specifically that jet pump powered watercraft were excluded, ". . . the fact that language could be more explicit does not render it ambiguous." (*Suarez* v. *Life Ins. Co. of North America*, *supra*, 206 Cal.App.3d 1396, 1406.) In view of the plain language of the policy, which excluded all watercraft powered by inboard motors, without qualification based on their means of propulsion, the exclusion was not ambiguous. Accordingly, the principle on which Yessian relies, requiring that ambiguities be resolved against the insurer, does not apply. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

b., c.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### d. *Mrs. Harmer's Community Property Interest*

 Yessian asserts that even if the watercraft exclusion barred coverage for Mr. Harmer, CCIC had a separate duty to cover Mrs. Harmer, who also was insured under the policy. Yessian points out that Mrs. Harmer's interest in the Harmers' community property was liable for any judgment against Mr. Harmer under former Civil Code sections 5120.110 and 5122 (see now, Fam. Code, §§ 910, 1000). Consequently, Yessian concludes, Mrs. Harmer faced potential liability which was not subject to the exclusion, because it was based not on her ownership or use of the Waverunner, but on her liability for Mr. Harmer's torts under the community property laws.

There is no indication in Yessian's complaint against the Harmers that she sought to hold Mrs. Harmer liable on this community property theory, or any other theory not based on ownership or use of the Waverunner. The complaint alleged that both Harmers owned the Waverunner, and that each of them was operating and directing it at the time of the accident. It also alleged that the Harmers were in joint possession and control of the Waverunner at that time. Mr. Yessian's complaint made the same allegations.

Even if we assume Yessian intended to assert an independent claim against Mrs. Harmer based solely on her community property interest, we cannot conclude CCIC was obligated to cover that claim. The only California case which, to our knowledge, has considered whether an insured's community property interest can provide an independent basis for coverage has rejected the proposition. In *Hartford Fire Ins. Co.* v. *Superior Court* (1983) 142 Cal.App.3d 406 [191 Cal.Rptr. 37], a homeowners general liability policy issued to a husband and wife excluded liability arising from ownership, maintenance, operation or use of any aircraft. The husband was killed when the plane he was flying crashed with four passengers aboard. The wife was not in the plane. The passengers filed actions against the wife, individually and as the representative of the husband's estate, for injuries sustained in the crash. All of the husband's and wife's community property was placed in probate, and the passengers claimed against that property.

The wife sought a determination she was entitled to a defense under the policy, arguing that " 'any judgment rendered in the tort case is enforceable against her community property, as a proximate result of her "act" of

---

*See footnote, *ante*, page 1682.

marrying Thomas F. Tobin, not of using an aircraft.' " (142 Cal.App.3d at p. 411.) The court held the insurer had no duty to defend the wife, stating: "Any potential liability on her part in this case could only have arisen out of the aircraft operations . . . . The relationship or marital status of the Tobins gave rise to no independently insurable event which would place this case beyond the aircraft exclusions in the policies." (*Id.*, at p. 416.)

*Hartford* is consistent with other California decisions finding no coverage where the act causing injury falls within an exclusion, even though the party seeking coverage did not participate in the act and is sought to be held liable only vicariously or for negligent supervision. In *Fire Ins. Exchange* v. *Altieri* (1991) 235 Cal.App.3d 1352 [1 Cal.Rptr.2d 360], the court held a homeowners policy provided no coverage to parents whose son injured a schoolmate in a fight. The court stated, "where, as here, the policy excludes coverage for bodily injury intended or expected by 'an' or 'any' insured, the cases have uniformly denied coverage for all claims, including negligent supervision claims." (*Id.*, at p. 1361.) Consequently, the parents were not covered even though liability against *them* was not based on any intentional act of *theirs*. (*Ibid.*) The court distinguished cases involving exclusions for intentional acts of *"the* insured," where it was possible to conclude the exclusion only barred coverage for the specific insured who committed the intentional act. (*Id.*, at pp. 1360-1361.)

*Altieri* was followed in *Western Mutual Ins. Co.* v. *Yamamoto* (1994) 29 Cal.App.4th 1474, 1486 [35 Cal.Rptr.2d 698], in which the court found no coverage under a homeowners policy for parents whose son used his father's gun to shoot a third party. Again, the policy excluded injuries intended by "an insured." (*Id.*, at p. 1481.)

The CCIC policy excluded injuries arising out of the ownership, maintenance or use of an inboard watercraft "owned by any insured." The unambiguous intent is to exclude coverage for *any* insured, even if liability of that insured does not arise from his or her personal ownership or use of the watercraft.

Yessian points out the CCIC policy contained a severability clause which provided that the policy applied "separately to each insured." She cites *Worcester Mut. Ins. Co.* v. *Marnell* (1986) 398 Mass. 240 [496 N.E.2d 158], *Northwestern Nat. Ins. Co.* v. *Nemetz* (1986) 135 Wis.2d 245 [400 N.W.2d 33] and *American Nat. Fire Ins.* v. *Fournelle Est.* (Minn. 1991) 472 N.W.2d 292. In each of those cases, the court held the existence of a severability clause required a finding of coverage for a coinsured who did not personally commit the act giving rise to liability, despite the policy's exclusion of

liability based on such an act if committed by "any insured" (*Worcester, American Nat.*) or "an insured" (*Northwestern*). The courts reasoned that a severability clause requires each insured be treated as having a separate insurance policy, so that the term "insured" in the exclusion must be interpreted to mean only the person claiming coverage. If liability against that person is not based on an excluded act committed by that person, he or she is covered. (See, e.g., *Worcester, supra*, 398 Mass. at p. 244 [496 N.E.2d at p. 161].)

It is not clear from *Hartford Fire Ins. Co. v. Superior Court, supra*, 142 Cal.App.3d 406, *Fire Ins. Exchange v. Altieri, supra*, 235 Cal.App.3d 1352, or *Western Mutual Ins. Co. v. Yamamoto, supra*, 29 Cal.App.4th 1474, whether the policies in those cases contained severability clauses. There appear to be no California decisions considering whether an exclusion based on the act of "an insured" precludes coverage of a different insured where there is a severability clause. However, we conclude the exclusion should apply.

First, the cases cited by Yessian represent only one view. Later cases from other jurisdictions have reached the opposite conclusion. (See discussion of conflicting authority in *Thoele v. Aetna Cas. & Sur.* (7th Cir. 1994) 39 F.3d 724, 727-728, fn. 1.) In *Northwest G.F. Mut. Ins. Co. v. Norgard* (N.D. 1994) 518 N.W.2d 179, 183-184, for example, the court held an exclusion for liability based on sexual molestation by "an insured" barred coverage of a wife for liability based on her husband's molestation of a child, even though the wife had no involvement in the molestation and notwithstanding a severability clause. Similarly, in *Chacon v. American Family Mut. Ins. Co.* (Colo. 1990) 788 P.2d 748, 752, the court held an exclusion for intentional conduct of "any insured" barred coverage of parents for their son's vandalism, despite a severability clause.

We find these decisions more persuasive than those on which Yessian relies. The court in *Norgard* acknowledged but rejected all three of Yessian's authorities. (518 N.W.2d at p. 182.) It reasoned that a clause excluding liability for specific conduct should prevail over a more general severability provision. It also noted the purpose of severability clauses is to afford each insured a full measure of coverage up to the policy limits, not to negate bargained-for and plainly worded exclusions. (*Id.*, at p. 183.)

We reach the same conclusion, at least in the context of this case, in which coverage is urged on the basis of the community property laws. Indeed, acceptance of Yessian's position would effectively nullify exclusions from coverage in any case involving married coinsureds and a policy with a

severability provision. A spouse could always demand a defense based on potential liability of his or her community property interest, regardless of whether the act giving rise to the liability was excluded. A spouse could make that demand even where, as here, he or she was expressly alleged to have participated in the tortious act. It is *inconceivable that parties to a policy would include clauses specifically excluding coverage for claims based on certain types of conduct, but intend those exclusions to have no effect in any case involving claims against coinsured spouses.*

2. *Duty to Defend**

. . . . . . . . . . . . . . . . . . . . . . . . .

B. *Yessian vs. Allstate*

1. *Coverage*

■ The Allstate policy provided liability coverage for bodily injury or property damage resulting from the ownership, maintenance or use of "covered watercraft, boat equipment or boat trailers." The "covered watercraft" was the Donzi. "Boat equipment" was defined to include dinghies and tenders "used to service" the covered watercraft.

The Harmers kept the Waverunner at their condominium in Bullhead City, Arizona, on the Colorado River. They regularly visited the condominium about 32 weekends a year. They took the Waverunner onto the Colorado River on most of their visits.

The Harmers kept the Donzi at a dock on Lake Mojave, five miles away from their condominium. Although they took the Waverunner to Lake Mojave on occasion, they took it there "[l]ess often" than they took it to the Colorado River. One of the purposes for which the Harmers purchased the Waverunner was to use it to travel between the Donzi and the shore. On occasion, when they took the Donzi to an island in the middle of Lake Mojave, they used the Waverunner to go between the island and the shore. They also used the Waverunner to carry water skiers to the Donzi instead of taking the Donzi to the shore to pick up the skiers.

As of June 1993, Mr. Harmer had taken the Donzi on the Colorado River only one time, in 1988, before the Harmers bought the Waverunner. He had used the Waverunner to carry water skiers to and from the Donzi only four or five times. Up until the time of the accident, he had used the Waverunner as a dinghy or tender on approximately two occasions. Mr. Harmer had

*See footnote, *ante,* page 1682.

never put the Waverunner on the Donzi and could not recall whether he had ever tied it to the Donzi.

Based on the above facts, Allstate made its second motion for summary judgment. It argued that because the Waverunner was not being "used to service" the Donzi when the accident occurred, there was no coverage. The lower court agreed and granted Allstate's motion.

Yessian does not dispute that the Harmers' use of the Waverunner on April 12, 1990, "was completely independent of the Donzi." However, she argues the court erred in interpreting the policy provision requiring a dinghy or tender to be "used to service" the covered watercraft to require it to be used for that purpose *at the time of the accident*. The parties agree the proper interpretation of the policy is a question of law.

### a. *Policy Interpretation*

As discussed previously, we are required to give language in an insurance policy "its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th 1, 18.) In the sense in which the term was used in the policy, a "dinghy" means a small boat used as a tender for a larger boat. (Webster's Third New Internat. Dict. (1964) p. 635.) A "tender" is defined as "a boat or small steamer for communication between shore and a larger vessel." (*Id.,* at p. 2355.)

Thus, a dinghy or tender, *by definition*, is a boat used to service another watercraft. Consequently, it would be redundant to speak of a dinghy or tender "used to service your watercraft" if the phrase meant only that *at some time* the smaller vessel was used to service the larger one. If the smaller craft were not used *at some time* to service the larger one, it would not qualify as a dinghy or tender at all. The requirement that the dinghy or tender be "used to service" the covered watercraft therefore must be read to impose a requirement *in addition* to the requirement that the smaller craft be used to service the larger vessel frequently enough to qualify as a "dinghy" or "tender" at all.

The most reasonable interpretation is that the policy was intended to require the smaller craft be used as a dinghy or tender routinely, as its sole or at least principal function. But we need not go that far to resolve this case. Instead, we need only conclude that the dinghy or tender must have been serving that function at the time of the event giving rise to liability. As it is undisputed the Waverunner was not being used for that purpose on April 12, 1990, there clearly was no coverage if the policy is interpreted in this manner.

We conclude such an interpretation is required. First, even assuming the words "used to service your watercraft" reasonably can be interpreted more than one way, we must interpret them in accordance with the " 'objectively reasonable expectations of the insured.' " (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, 1265.) ■ If an insured could not reasonably expect coverage, the principle requiring construction in favor of coverage where more than one reasonable interpretation is possible does not apply. (*Ibid.; Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) "A party's reasonable expectation of coverage is a question of law not a question of fact." (*Suarez* v. *Life Ins. Co. of North America, supra,* 206 Cal.App.3d 1396, 1406.)

In determining whether coverage is consistent with an insured's objectively reasonable expectations, "the court must interpret the language in context, with regard to its intended function in the policy." (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.) The court "may also employ 'common sense.' " (*Cooper Companies* v. *Transcontinental Ins. Co., supra,* 31 Cal.App.4th at p. 1106, quoting *Bank of the West, supra,* at p. 1276.) In addition, the court may consider the manner in which premiums are assessed under the policy. (31 Cal.App.4th at p. 1108.)

In *Cooper Companies, supra,* the court applied these principles to interpret two policies which provided liability coverage for companies "hereafter acquired" by the insured company. The issue was whether the policies covered companies acquired *after* the policies expired. Although the court found the language was ambiguous, it concluded an insured could have an objectively reasonable expectation of coverage only for companies acquired during the policy period. (31 Cal.App.4th at p. 1106.) The court reasoned the "finite policy period" set forth in the policies was necessary "both to circumscribe the time in which an insurable event may occur and to provide a time for auditing for purposes of fixing premiums." (*Id.,* at p. 1107.) Because premiums were based on gross sales of the acquired companies at the end of the policy period, there was no way to assess premiums for companies acquired after the policies expired. (*Id.,* at p. 1108.)

■ Applying a similar analysis here, we conclude the Harmers could not reasonably expect their Allstate policy to cover as "boat equipment" watercraft not actually being used to service the Donzi at the time of the event causing liability. A contrary interpretation would mean Allstate would be required to cover, for the entire term of the policy, any smaller craft which had *ever* been used to service the Donzi on any occasion. The Harmers could obtain coverage for an unlimited number of smaller craft,

simply by using each of those craft in conjunction with the Donzi *at some time*. The court in *Cooper Companies, supra*, noted construing a contract to confer a right in perpetuity is disfavored. (31 Cal.App.4th at p. 1103.) Similarly, we think it would be improper to interpret a policy written to cover a specific vessel and its attendant smaller craft to confer coverage for an unlimited number of smaller craft, even while they are being used independently of the covered vessel.

The manifest "intended function in the policy" (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1265) of the "boat equipment" provision was to provide coverage for equipment, including dinghies and tenders, acquired and used as an integral part of the operation of the covered vessel. Although the Waverunner could be, and occasionally had been, used with the Donzi, its main use was as an independent means of transportation and recreation on a different body of water. Additionally, no separate premium was assessed for boat equipment, supporting the conclusion that coverage was expected by the parties to extend to such equipment only while it was being used with the covered vessel.

Yessian argues that because the policy covered liability arising from the "ownership, maintenance, *or* use" of boat equipment (italics added), coverage existed for liability based on the Harmers' ownership of the Waverunner regardless of its use. That argument is at odds with the policy language. The policy *defines* "boat equipment" to include dinghies and tenders "used to service your watercraft." Accordingly, a dinghy or tender which is not being used for that purpose is not "boat equipment" and liability based on the ownership of it is not covered.

Yessian asserts that under *American Star Ins. Co.* v. *Insurance Co. of the West* (1991) 232 Cal.App.3d 1320 [284 Cal.Rptr. 45], once the Waverunner fell within the classification of "boat equipment," its actual use on the day of the accident was irrelevant. We do not read the case that way. In *American Star*, the policy excluded an "auto" but covered a vehicle "designed for use principally off public roads." The court held this definition covered a water truck, even though the truck was being used *on* a public road when it caused an accident. The court noted the truck was normally used off road, was not licensed for road use, and was geared so that it could not exceed 25 miles per hour. It concluded that "[t]he 'intended' or 'designed' use of the water truck was for 'off public roads.'" (*Id.*, at p. 1328.)

The differences between *American Star* and this case are readily apparent. Most importantly, in *American Star*, the policy language expressly focused

on whether a vehicle was *"designed"* for use principally off road. It did not address the *actual* use of the vehicle at all. Here, conversely, the policy expressly required that a dinghy be *"used"* to service the covered craft. It did not refer to the use for which the dinghy was "designed." Accordingly, although the actual use of the vehicle was not determinative of the coverage question in *American Star*, it does not follow that it should not be determinative here.

Additionally, in *American Star* the vehicle was "normally" used off road, and, in fact, was not even licensed or suitable for road use. In contrast, there is no claim here that the Waverunner was "normally" used as a dinghy for the Donzi, or that it was not suitable for any other use. As stated earlier, the record established that in a period of three years after they purchased the Waverunner, the Harmers had used it independently of the Donzi approximately thirty-two weekends a year, but had used it as a tender for the Donzi only four or five times.

 b., c.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

 2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

C.-E.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The judgments are affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.

---

*See footnote, *ante*, page 1682.