**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NORTHROP GRUMMAN CORPORATION,
*Plaintiff-Appellee,*

v.

FACTORY MUTUAL INSURANCE
COMPANY,

*Defendant-Appellant.*

No. 07-56760

D.C. No.
CV-05-08444-DDP

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
July 18, 2008—Pasadena, California

Filed August 14, 2008
Amended April 2, 2009

Before: Cynthia Holcomb Hall and Pamela Ann Rymer,
Circuit Judges, and Stephen M. McNamee,* District Judge.

Opinion by Judge Hall

*The Honorable Stephen M. McNamee, United States District Judge for
the District of Arizona, sitting by designation.

3925

---

**COUNSEL**

Kirk A. Pasich, Esq., Los Angeles, California, for the plaintiff-appellee.

Peter Abrahams, Esq., Encino, California, for the defendant-appellant.

---

**ORDER**

The Opinion filed on August 14, 2008, is amended as follows:

Slip Opinion page 10671, line 19, insert the following text: "We will 'not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.' " *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985)).

Page 10672, line 6, replace "*Sher v. Lafayette Ins. Co.*, ____So. 2d. ___" with "*Sher v. Lafayette Ins. Co.*, 988 So. 2d. 186".

Page 10673, line 1, insert the following text (beginning a new paragraph): "Furthermore, the dictionary definition of flood comports with the lay understanding of the term. Most

individuals would describe the inundation caused by a hurricane as a 'flood.' *See E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal. 4th 465, 471 (2004) (describing 'elementary rules of contract interpretation that policy language is interpreted in its ordinary and popular sense and as a layman would read it and not as it might be analyzed by an attorney or an insurance expert' (internal citations ommitted)); *compare MacKinnon*, 73 P.3d 1205 (finding 'pollution' ambiguous when dictionary definition did not agree with the lay person's understanding and applying the dictionary definition would lead to absurd results)."

Page 10673, line 20, delete: "To begin with, we are not convinced by Northrop's argument that the primary and excess policies must be construed as one document."

Page 10673, line 26, replace "the primary policy may be consulted in interpreting the excess policy, we decline to treat the two documents as one contract." with "the primary policy must be consulted in interpreting the excess policy, *see* Cal. Civ. Code § 1642, we decline to treat the two documents as only one contract."

Page 10674, line 7, replace "that an ambiguity exists" with "that an ambiguity must exist".

Page 10674, line 14, replace "policy." with "policy, because the insured's interpretation was not reasonable under either definition."

Page 10674, line 16, insert the following text: "Similarly, under either definition of flood, Northrop's limited interpretation of the broad term 'flood,' as excluding wind-driven flooding, is not reasonable."

Page 10674, line 17, move "Northrop relies on *Powerine Oil*" to begin a new paragraph.

Page 10676, line 13, insert the following text: "Here, because the other terms used to describe flood were merely descriptive of floods, or synonymous for flood, rather than separate exclusions, the absence of 'whether driven by wind or not' is not rendered surplusage in the primary policy, nor is it necessary to the excess policy's definition, where the term flood is sufficiently broad to encompass the damage Northrop suffered. *See Brodkin v. State Farm Fire & Casualty Co.*, 217 Cal.App.3d 210, 217 (Ct. App. 1990) (holding exclusion applied to damage suffered by insureds, though the synonym 'corrosion' or other descriptors was not included, because the plain meaning of the exclusion of 'leakage or seepage,' 'wear, tear' and 'deterioration' covered the damage suffered); *see also Smyth*, 7 Cal. Rptr. 2d at 697 (holding that definition of 'business' in primary policy as 'trade, profession, or occupation' did not create an ambiguity, though 'business' was defined in the umbrella policy as 'trade, occupation, profession or business')."

Page 10676, line 13, move "In addition" to begin a new paragraph.

Page 10676, line 17, insert the following text: "Neither has Northrop cited any cases holding that hurricane storm surge is not within the meaning of a flood exclusion, or holding that the phrase 'whether driven by wind or not' is necessary to signify that storm surge is included within a flood exclusion."

Page 10677, line 18, insert the following text: "Moreover, even the definition of Named Windstorm noted that such storms can cause flood damage, only strengthening the argument that the lay interpretation of flood includes flooding caused by storm surge."

Page 10678, line 1, delete the following text: "Neither the absence of the phrase 'whether driven by wind or not' nor the terms Wind and Named Windstorm in the excess policy render the excess policy ambiguous, and therefore we need not

consider the extrinsic evidence presented by the parties. *See Fraley v. Allstate Ins. Co.*, 97 Cal. Rptr. 2d 386, 390 (Ct. App. 2000) ('Extrinsic evidence may be admitted to aid in the interpretation of an insurance policy only where the terms are ambiguous.').)."

Page 10678, line 1, insert the following text: "Despite the unambiguous policy language, however, we must preliminarily consider Northrop's extrinsic evidence to determine whether it creates an ambiguity. *Barris Industries, Inc. v. Worldvision Ent., Inc.*, 875 F.2d 1446, 1450 (9th Cir. 1989). For example, Northrop points to a sentence in the Underwriting Detail provided to Factory Mutual by Aon, which states '[s]torm surge loss estimates are included in our windstorm analysis unless mentioned otherwise.' This sentence, however, was included on a document specifically addressing only the risks of earthquakes and coastal windstorms striking covered Northrop facilities, and, like the Named Windstorm definition in the primary policy, also described storm surge as flooding. The parties also cite inconclusive and conflicting evidence regarding the treatment of previous storm surge damage caused by Hurricanes Georges and Isabel. Neither claim implicated excess policy coverage and the evidence is of little relevance in construing this excess policy. We find the extrinsic evidence 'insufficient to render the contract susceptible to [Northrop's] proffered interpretation' of flood as excluding flooding caused by storm surge. *See id.*"

With these amendments, the panel has voted to deny appellee's petition for panel rehearing and has recommended denial of the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing will be entertained.

## OPINION

HALL, Circuit Judge:

Factory Mutual Insurance Company appeals the district court's summary judgment in favor of Northrop Grumman Corporation. Northrop sued the insurance company after Factory Mutual denied coverage for water damage at Northrop's Mississippi subsidiary caused by Hurricane Katrina. Factory Mutual argued that coverage for water damage was barred by an exclusion for flooding in the policy, but the district court held that the exclusion was ambiguous and construed it in favor of Northrop. We reverse the district court's grant of summary judgment in favor of Northrop, and remand for a determination of whether California's efficient proximate cause doctrine mandates coverage of the damage notwithstanding our interpretation of the contractual language.

## I.   FACTS AND PROCEEDINGS BELOW

### A.   *The parties and the insurance policies at issue*

Northrop Grumman is a global defense contractor with approximately 120,000 employees worldwide. Its Mississippi subsidiary, Northrop Grumman Ship Systems, is headquartered in Pascagoula, Mississippi and has operations throughout the Gulf area. Northrop maintains a risk management department, and is represented by Aon Risk Services in the insurance marketplace.

Aon was responsible for brokering Northrop's property insurance for April 2005 to April 2006. In February 2005, Aon prepared and submitted an Underwriting Detail to prospective insurers. The Underwriting Detail explained that Northrop sought blanket insurance for $19.8 billion in properties, and proposed that the insurance be layered. The primary layer, termed "All Risk including Earthquake, Flood, Boiler & Machinery," would provide comprehensive property insur-

ance with a general limit of $500 million, and certain sub-limits, such as a $400 million sublimit per flood occurrence. The excess layer, described as "All Risk including Boiler & Machinery (Excluding Earthquake and Flood)," would cover additional losses up to the $19.8 billion total value of Northrop's property, but would not include earthquake or flood coverage. The suggested premiums were $12,730,000 for the primary layer, and $950,000 for the excess layer.

Factory Mutual received the Underwriting Detail and provided Northrop with a quote for 15% participation in the first $100 million of the primary layer, and full participation in the excess layer. Northrop accepted the quote and Factory Mutual transmitted the primary and excess policies to Northrop.

The primary policy, derived from a hybrid Aon/Factory Mutual form,[1] was an "all risk" policy, insuring Northrop against "all risk of physical loss or damage to property" unless otherwise excluded. The policy included a glossary section which defined various terms, including certain types of losses, such as Flood, Wind, and Named Windstorm. The policy defined Flood as:

> all physical loss or damage caused by or resulting from flood waters, rising waters, waves, tide or tidal water, surface waters, or the rising, overflowing, or breaking of boundaries of lakes, reservoirs, rivers, streams or other bodies of water, whether driven by wind or not, including spray and sewer back-up resulting from any of the foregoing, all regardless of any other cause or event contributing concurrently or in any other sequence of loss.

Wind was defined as "[d]irect action of wind including

---

[1]The hybrid form was drafted by Aon, but made available to Factory Mutual's clients who used Aon as a broker.

substance driven by wind." Named Windstorm was separately defined as:

> [t]he direct action of wind including any substance driven by wind, and/or flood when such wind or flood is associated with or occurs in conjunction with a storm or weather disturbance which is identified by name prior to loss by any meteorological authority such as the U.S. National Weather Service or National Hurricane Center.

The excess policy, which was derived from Factual Mutual's own Advantage form, was also an "all risk" policy. The excess policy provided Northrop with $19.8 billion of insurance in excess of the $500 million covered by the primary policy, and insured Northrop for all risks unless specifically excluded. The excess policy excluded loss or damage caused by various occurrences, including Flood (the Flood Exclusion). Flood was defined as:

> Flood; surface waters; rising waters; waves; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical damage by fire, explosion or sprinkler leakage resulting from Flood is not considered to be loss by Flood within the terms and conditions of this Policy.

Neither Named Windstorm damage nor Wind damage was defined or otherwise referenced in the excess policy.

### B.   Hurricane Katrina and the damage to Northrop's shipyards

On August 29, 2005, Hurricane Katrina struck the Gulf Coast, making landfall near the Louisiana/Mississippi border. Katrina was one of the strongest storms to impact the coast of the United States in the past 100 years, with wind speeds of up to nearly 175 miles per hour and an accompanying storm surge that inundated parts of Louisiana, Alabama, and Mississippi.[2] Northrop's ship building subsidiaries located in the Gulf region were severely damaged by the storm. The majority of the loss occurred at the Pascagoula, Mississippi shipyards, where the storm surge was as high as twenty-two feet. According to the shipyard manager, Steve Pierce, the Pascagoula yard sustained water damage to transporters, translation cars, electrical systems, and other property, as well as wind damage to the roofs of the buildings. Photographs on the day of the hurricane showed trucks in the shipyard halfway submerged in water, and Pierce estimated that buildings were covered in six to ten feet of water in some parts of the shipyard. Northrop's preliminary estimates put the damage to its property as a result of the hurricane at $1,257,100,000, primarily attributable to the damage at the Pascagoula shipyards.

Northrop timely notified its insurers of the loss it suffered from Hurricane Katrina. Factory Mutual paid Northrop $15 million under the primary policy, but informed Northrop that it was planning to examine the damages under the excess policy as two separate perils: a loss caused by wind, which has no limitation on the amount of coverage, and a loss caused by flood, which was not covered at all due to the Flood Exclusion.

---

[2]The National Hurricane Center describes storm surge as "water that is pushed toward the shore by the force of the winds swirling around the storm . . . [which] combines with the normal tides to create the hurricane storm tide . . . . ." *See* National Hurricane Center, Storm Surge, http://www.nhc.noaa.gov/HAW2/english/storm_surge.shtml (last visited July 31, 2008).

*C.   This Litigation*

On November 4, 2005, Northrop filed suit against Factory Mutual in California state court, demanding coverage for the water damage under the excess policy. Factory Mutual removed the case to the Central District of California, and the parties filed cross-motions for partial summary judgment on Northrop's cause of action for declaratory relief — specifically, whether the Flood Exclusion in the excess policy barred coverage for the water damage from Hurricane Katrina.

On August 16, 2007, the district court granted Northrop's motion for partial summary judgment. The court agreed with Northrop that the Flood Exclusion was ambiguous because it did not "plainly and clearly reference hurricanes or damage caused by wind." The court then deferred to what it found to be Northrop's reasonable interpretation of the Flood Exclusion — that it was limited to floods not caused by wind.

Factory Mutual filed an unopposed motion for entry of final judgment under Fed. R. Civ. P. 54(b). The district court found no cause for delay and granted the motion on November 20, 2007. Factory Mutual timely appealed.

## II.   STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo, under the same standards applied by the district court. "We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997).

## III.   DISCUSSION

**[1]** Though insurance contracts have special features, the general rules of contract interpretation still apply in California.[3] *Bank of the W. v. Superior Court*, 833 P.2d 545, 551 (Cal. 1992); *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1212 (Cal. 2003). The interpretation of a contract must "give effect to the 'mutual intent' of the parties . . . at the time the contract was formed." *Id.* at 1212-13 (citing Cal. Civ. Code § 1636). Such intent is to be inferred, if possible, from the written provisions of the contract based on their "ordinary and popular sense," unless a "technical sense or special meaning is given to them by their usage." *Id.* at 1213. (citing Cal. Civ. Code §§ 1639, 1644, 1638). If the contractual language is clear and explicit, it governs. *Id.*; *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990). Ambiguous terms are generally construed against insurers, but "[a] policy provision is ambiguous *only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." *Palmer v. Truck Ins. Exch.*, 988 P.2d 568, 573 (Cal. 1999). "We will 'not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.' " *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985)).

**[2]** In this case, an examination of the written provisions of the excess policy, understood in their ordinary and popular sense, leads to the result that the Flood Exclusion encompasses the water damage to Northrop's shipyards. The first word used to define the term Flood in the excess policy was

---

[3]The district court applied California law because Factory Mutual did not argue that any other any other law should control. On appeal, Factory Mutual does not dispute that California law applies to the interpretation of the excess policy.

"flood." Both lay and legal dictionaries characterize flood as an overflowing or inundation of water over usually dry land. *See* American Heritage Dictionary of the English Language 674 (4th ed. 2000) ("[a]n overflowing of water onto land that is normally dry"); Merriam-Webster's Collegiate Dictionary 480 (11th ed. 2003) ("a rising and overflowing of a body of water esp. onto normally dry land"); Black's Law Dictionary 640 (6th ed. 1990) ("[a]n inundation of water over land not usually covered by it").[4]

**[3]** Courts have endorsed these dictionary meanings of flood as the ordinary, plain meaning of the word. *See*, *e.g.*, *Sher v. Lafayette Ins. Co.*, 988 So. 2d. 186, 2008 WL 928486 (La. April 8, 2008) ("The plain, ordinary, and generally prevailing meaning of the word 'flood' is the overflow of a body of water causing a large amount of water to cover an area that is usually dry."); *Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 680-81 (Colo. 1989) (relying on dictionaries to define flood as "an overflowing of water on an area normally dry"); *Stover v. United States*, 204 F. Supp. 477, 485 (C.D. Cal. 1962) ("A 'flood' is water which inundates an area of the surface of the earth where it ordinarily would not be expected to be."), *aff'd*, 332 F.2d 204 (9th Cir. 1964). We follow the same approach here, and find that the water damage to Northrop's shipyards falls squarely within the ordinary and plain meaning of flood. The shipyards, which were covered in up to ten feet of water, unquestionably experienced "an inundation of water over normally dry land," and therefore experienced a flood within the meaning of the excess policy. *See Kane*, 768 P.2d at 681 ("The inundation of insureds' normally dry land falls squarely within the[ ] generally accepted definitions of the term

---

[4]Contrary to the district court's finding, dictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in an insurance contract. *Jordan v. Allstate Ins. Co.*, 11 Cal. Rptr. 3d 169, 176 (Ct. App. 2004) ("It is well settled that in order to construe words in an insurance policy in their 'ordinary and popular sense,' a court may resort to a dictionary." (citing *Scott v. Continental Ins. Co.*, 51 Cal. Rptr. 2d 566, 569 (Ct. App. 1996)).

'flood.' "). Moreover, the other terms used to define Flood in the excess policy —"rising waters," "waves," and "tide or tidal water" — also describe the type of damage Northrop experienced. *See*, *e.g.*, *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 437 (5th Cir. 2007) ("The phrase 'storm surge' is little more than a synonym for a 'tidal wave' or wind-driven flood . . . ." ).

Furthermore, the dictionary definition of flood comports with the lay understanding of the term. Most individuals would describe the inundation caused by a hurricane as a "flood." *See E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal. 4th 465, 471 (2004) (describing "elementary rules of contract interpretation that policy language is interpreted in its ordinary and popular sense and as a layman would read it and not as it might be analyzed by an attorney or an insurance expert" (internal citations ommitted)); *compare MacKinnon*, 73 P.3d 1205 (finding "pollution" ambiguous when dictionary definition did not agree with the lay person's understanding and applying the dictionary definition would lead to absurd results). Thus, the plain language of the Flood Exclusion unambiguously bars coverage for the water damage to Northrop's shipyards.

Northrop argues that this interpretation is flawed because it fails to read the excess policy in light of the primary policy. Northrop points out that the phrase "whether driven by wind or not" is used in the primary policy's definition of Flood but does not appear in the excess policy's definition of flood, even though the phrase is used elsewhere in the excess policy. It also notes that while the terms Wind and Named Windstorm were defined in the primary policy, they were not referenced or excluded from coverage in the excess policy. According to Northrop, these distinctions demonstrate that the Flood Exclusion is ambiguous, because when the excess policy is read in the context of the primary policy, it fails to clearly and explicitly include wind-driven flood damage. *See State Farm Mut. Auto. Ins. Co. v. Jacober*, 514 P.2d 953, 958

(Cal. 1973) (exclusions in insurance contracts must be conspicuous and clear).

We disagree. We recognize that insurance policies must be construed in context, *Palmer*, 988 P.2d at 572-73, but in this case, Northrop urges us to find an ambiguity based on differing language in two separate policies. Though the primary policy must be consulted in interpreting the excess policy, *see* Cal. Civ. Code § 1642, we decline to treat the two documents as only one contract. *See*, *e.g.*, *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.*, 260 Cal. Rptr. 190, 197 (Ct. App. 1989) (" 'While it is the rule that several contracts relating to the same matters are to be construed together . . . it does not follow that for all purposes they constitute one contract.") (quoting *Malmstedt v. Stillwell*, 294 P. 41, 42 (Ct. App. 1930)); *Powerine Oil Co. v. Superior Court*, 118 P.3d 589, 602-03 (Cal. 2005) (considering primary policy in interpreting excess policy but not construing them as one document). Consequently, Northrop's citation to cases addressing inconsistent definitions within a single policy is unhelpful. *See*, *e.g.*, *Mirpad*, *LLC v. California Ins. Guarantee Ass'n*, 34 Cal. Rptr. 3d 136, 146 (Ct. App. 2005) (rejecting definition of person to include organization because organization was defined separately in the policy).

**[4]** Moreover, the case law addressing multiple policies does not support Northrop's view that an ambiguity must exist because of the different definitions of Flood in the primary and excess policies. In fact, in *Smyth v. USAA Prop. & Cas. Ins. Co.*, 7 Cal. Rptr. 2d 694 (Ct. App. 1992), the court explicitly rejected a similar argument, holding that the meaning of the term "business" in an excess policy was unambiguous and clear even though it was defined differently in the primary policy, because the insured's interpretation was not reasonable under either definition. *Id.* at 697 ("That this definition is not identical in the primary and excess policies does not create an ambiguity."). Similarly, under either definition

of flood, Northrop's limited interpretation of the broad term "flood," as excluding wind-driven flooding, is not reasonable.

Northrop relies on *Powerine Oil*, but that case does not show that differences between a primary and excess policy control judicial interpretation. In *Powerine*, the court held that coverage for "damages . . . and expenses" in an excess policy extended beyond court-awarded monetary damages. 118 P.3d at 601-02. While *Powerine* noted certain differences between primary and excess policy language in interpreting the excess policy — the primary policy covered only "damages," whereas the excess policy included "damages . . . and expenses" — these distinctions did not drive the court's result. *Id.* at 601-02. Rather, the court focused on the addition of the word "expenses" within the excess policy itself in determining the breadth of coverage. *Id.* at 602 ("We agree with the Court of Appeal that the addition of the term 'expenses' in the central insuring clause of these excess/umbrella policies extends coverage beyond the limitation imposed were the term 'damages' used alone . . . ." ). Accordingly, the different definitions of Flood in the primary and excess policies do not create ambiguity.

In a variation of the same argument, Northrop contends that the absence of the phrase "whether driven by wind or not" in the Flood Exclusion evidences an intent on Factory Mutual's part to expand coverage to include wind-driven flood. Relying on *Maxconn*, *Inc. v. Truck Ins. Exch.*, 88 Cal. Rptr. 2d 750, 758 (Ct. App. 1999) ("The absence of an expression or word in a policy is clearly an appropriate consideration in the interpretation of contracts."), and *Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*, 115 Cal. Rptr. 2d 26, 33 (Ct. App. 2001) ("[A]n insurance company's failure to use available language to exclude certain types of liability gives rise to the inference that the parties intended not to so limit coverage."), Northrop argues that Factory Mutual could and should have used the phrase "whether driven by wind or not" in the Flood Exclusion if it wanted to limit coverage, and that its failure to do

so must be read as expanding coverage. Northrop correctly observes that Factory Mutual used the phrase "whether driven by wind or not" not only in the primary policy, but also elsewhere in the excess policy, and that it used similar language in earlier policies issued to Northrop. Northrop also argues that inclusion of the phrase "whether driven by wind or not" in flood exclusions is industry custom, and that Factory Mutual defied custom when it created a purportedly narrower exclusion for flood damage.

[5] We are not convinced that the absence of the phrase "whether driven by wind or not" renders the otherwise clear language of the Flood Exclusion ambiguous. *Maxconn* and *Fireman's Fund* are distinguishable as involving more conspicuous omissions than the one here,[5] and we view the failure to include the phrase "whether driven by wind or not" as more indicative of a lack of specificity on Factory Mutual's part than an omission evidencing its intent to narrow its exclusion. *See California Cas. Co. v. Northland Ins. Co.*, 56 Cal. Rptr. 2d 434, 440 (Ct. App. 1996) ("Although it might have promoted clarity in CCIC's policy to state specifically that jet pump powered watercraft were excluded, 'the fact that language could be more explicit does not render it ambiguous.' "

---

[5]For example, in *Maxconn*, the insured attempted to argue that a provision covering "infringement of copyright, title or slogan" included patent infringement. The court disagreed, holding that "[t]he absence of any express reference to patent infringement [which was a 'distinct legal claim governed by a vast body of statutory and case law'] would lead a reasonable layperson to the conclusion that patent infringement is not covered." 88 Cal. Rptr. 2d at 755-56. In contrast, the omitted phrase here — "whether driven by wind or not" — is not a distinct legal claim whose absence would be equally noticeable.

In *Fireman's Fund*, the court rejected the insurer's narrow interpretation of the phrase "arising out of," and suggested that the insurer should have included qualifying language if it wanted to limit the phrase given that "courts have been broadly interpreting [that language] since at least 1986." 115 Cal. Rptr. 2d at 30. Here, there is no narrow interpretation of flood exclusions omitting the phrase "whether driven by wind or not" that would have put Factory Mutual on notice to include qualifying language.

(citing *Suarez v. Life Ins. Co. of N. Am.*, 254 Cal. Rptr. 377, 383 (Ct. App. 1988)); *Great Western Drywall, Inc. v. Interstate Fire & Cas. Co.*, 74 Cal. Rptr. 3d 657, 664 (Ct. App. 2008) (also rejecting premise that exclusion was ambiguous because it could have been drafted with more clarity). Here, because the other terms used to describe flood were merely descriptive of floods, or synonymous for flood, rather than separate exclusions, the absence of "whether driven by wind or not" is not rendered surplusage in the primary policy, nor is it necessary to the excess policy's definition, where the term flood is sufficiently broad to encompass the damage Northrop suffered. *See Brodkin v. State Farm Fire & Casualty Co.*, 217 Cal.App.3d 210, 217 (Ct. App. 1990) (holding exclusion applied to damage suffered by insureds, though the synonym "corrosion" or other descriptors was not included, because the plain meaning of the exclusion of "leakage or seepage," "wear, tear" and "deterioration" covered the damage suffered); *see also Smyth*, 7 Cal. Rptr. 2d at 697 (holding that definition of "business" in primary policy as "trade, profession, or occupation" did not create an ambiguity, though "business" was defined in the umbrella policy as "trade, occupation, profession or business").

In addition, Northrop has not shown that it is industry custom to use the phrase "whether driven by wind or not" in flood exclusions, weakening its argument that Factory Mutual bucked a trend when it left the language out.[6] Neither has

---

[6]Factory Mutual's experts stated that "[t]here is no custom and practice in the insurance industry to use the phrase 'whether driven by wind or not' either to exclude coverage for, or provide coverage for, storm surge flood damage." Northrop cites a handful of cases that use the phrase "whether driven by wind or not," but Factory Mutual also cites cases in which that term is not noted or discussed in flood exclusions. Northrop notes that the Insurance Service's Office's Standard Property Policy Form refers to wind-driven floods, but other standard policies — such as the National Flood Insurance Program standard policy and a 2002-2003 Lloyd's of London Primary Master Policy issued to Northrop — do not reference the phrase.

Northrop cited any cases holding that hurricane storm surge is not within the meaning of a flood exclusion, or holding that the phrase "whether driven by wind or not" is necessary to signify that storm surge is included within a flood exclusion.

[6] Last, it is of no import that the primary policy defined the term Named Windstorm and Wind and that those terms were not referenced in the excess policy. The primary policy was an all risk policy, covering all acts unless specifically excluded. *Strubble v. United Servs. Auto Ass'n*, 110 Cal. Rptr. 828, 831 (Ct. App. 1973). Accordingly, defining Named Windstorm and Wind in the primary policy did not *create* coverage that the excess policy failed to exclude. Rather, a sensible reading of the primary policy suggests that the terms were defined to explain when the special Named Windstorm deductible would apply.[7] *See Six Flags Inc. v. Westchester Surplus Lines Ins. Co.*, 535 F. Supp. 2d 744, 754 (E.D. La. 2008) (term "Weather Cat Occurrence" simply "lumps all losses or damages occurring within a 72-hour period of time into one covered loss for adjustment purposes."). Because there was no defined coverage for Wind nor Named Windstorm, there was no reason for the excess policy — which was also an all risk policy, and included no deductible for Named Windstorm — to specifically exclude or even reference those terms. Moreover, even the definition of Named Windstorm noted that such storms can cause flood damage, only strengthening the argument that the lay interpretation of flood includes flooding caused by storm surge. Accordingly, no ambiguity results in the excess policy based on the labels placed on certain types of damages in the primary policy. *See id.* at 754-55 (flood sublimit unambiguously applied to storm surge damages from Hurricane Katrina even though those damages were separately described in the defined term "Weather Cat Occurrence").[8]

---

[7]There was a $10 million deductible for Named Windstorms, whereas the policy had a general deductible of $1 million.

[8]*Pinnacle Entm't, Inc. v. Allianz Global Risk US Ins. Co.*, No. 2:06-CV-00935-BES-PAL, slip op., at 9 (D. Nev. Mar. 26, 2008), cited by Nor-

**[7]** In light of the above, we hold that the Flood Exclusion unambiguously bars coverage for the water damage to Northrop's shipyards under the excess policy. The words used to define the Flood Exclusion, understood in their ordinary and popular sense, clearly and conspicuously preclude coverage for the water damage at Northrop's shipyards. *State Farm Mut. Auto. Ins. Co.*, 514 P.2d at 958. Despite the unambiguous policy language, however, we must preliminarily consider Northrop's extrinsic evidence to determine whether it creates an ambiguity. *Barris Industries, Inc. v. Worldvision Ent., Inc.*, 875 F.2d 1446, 1450 (9th Cir. 1989). For example, Northrop points to a sentence in the Underwriting Detail provided to Factory Mutual by Aon, which states "[s]torm surge loss estimates are included in our windstorm analysis unless mentioned otherwise." This sentence, however, was included on a document specifically addressing only the risks of earthquakes and coastal windstorms striking covered Northrop facilities, and, like the Named Windstorm definition in the primary policy, also described storm surge as flooding. The parties also cite inconclusive and conflicting evidence regarding the treatment of previous storm surge damage caused by Hurricanes Georges and Isabel. Neither claim implicated excess policy coverage and the evidence is of little relevance in construing this excess policy. We find the extrinsic evidence "insufficient to render the contract susceptible to [Northrop's] proffered interpretation" of flood as excluding flooding caused by storm surge. *See id.*

## CONCLUSION

We reverse the district court's summary judgment in favor of Northrop. We remand for consideration of Northrop's argument that California's efficient proximate cause doctrine

---

throp, does not demonstrate otherwise. That case is an unpublished memorandum out of the District of Nevada, and its holding was based on the district court's reasoning in this case, which we disagree with here.

demands coverage of the water damage notwithstanding the language of the contract. *See*, *e.g.*, *Julian v. Hartford Underwriters Ins. Co.*, 110 P.3d 903, 904 (Cal. 2005). Though the parties briefed the issue on appeal, we decline to consider it in the first instance because it involves factual considerations.

Reversed and Remanded.